Laramore, Judge,
delivered the opinion of the court:
In this case the Nez Perce Tribe of Indians appeals from a decision of the Indian Claims Commission[1] that it is not entitled to a recovery under section 2, clauses (3) and (5) of the Indian Claims Commission Act.[2]
Appellant claims additional compensation for the reservation lands which it ceded to the United States by the Agreement of May 1, 1893, ratified August 15, 1894, 28 Stat. 286, 326-332. Prior to the Agreement, appellant owned a treaty reservation[3] in northern Idaho which contained some 762,000 acres. Under the Agreement, part of the reservation was allotted to individual Indians and to the Tribe for trust lands. The remaining land, comprising 549,559 acres was ceded to the appellee for a purchase price of $2.97 per acre. The appellant contended before the Commission that the ceded lands had a fair market value of $12.63 per acre on August 15, 1894, the agreed valuation date. The appellee argued that *819 tlie evidence supported a value of $1.29 per acre. The Commission indicated that the evidence would support a value of $4 per acre as a maximum,[4] but decided that the $2.97 per acre which the appellant received was not sufficiently less than the maximum $4 value to be considered “unconscionable.” In addition, the Commission concluded that appellant had not succeeded in establishing that there was any fraud or duress or unfair and dishonorable dealing in connection with the negotiations and execution of the Agreement. In a concurring opinion, Commissioner Scott wrote that he personally found the discrepancy unconscionable, particularly viewed in gross — i.e., the $1.03 difference multiplied by the 549,559 acres involved amounts to $566,045.77. However, he felt bound by precedents indicating that the discrepancy must be “very gross.” [5] We are of the view that there is substantial evidence in the record indicating a value of $4 per acre, but unlike the Commission, we think this is a minimum figure. We agree with the Commission that the appellant has not shown fraud or duress or that the dealings were other than “fair and honorable.” We disagree, however, with the Commission’s view of the law of unconscionable consideration and, accordingly reverse and remand the case for further proceedings.
By way of background, the Nez Perce Tribe in 1855 ceded to the United States a tremendous area in the Territory of Washington which then included what is now part of the present State of Washington and northern Idaho. This agreement or treaty was ratified in 1859. 12 Stat. 957. In its Article II, the agreement provided for a large reservation, a portion of which was later ceded in 1894 and is involved here. The relevant portion of the 1859 reservation was located in northern Idaho just east of Lewiston. The area consisted mainly of a high and gently undulating plateau cut into blocks by canyons. The rainfall, climate, and soils, were generally favorable for the raising of cereal crops, especially wheat. The area was an extension of the Palouse *820 country and bad similar soils. Slightly over one-half of the ceded area had a highest and best use for agriculture. Somewhat less than one-quarter of the ceded area had a highest and best use as timberland. These areas contained a good commercial grade of timber for which there was an expanding local market. The remaining land was classified as range land and was well-suited for livestock grazing.
By 1894, the Lewiston area was fairly well-settled and growing. The city itself was founded in 1861 at the confluence of the Snake and 'Clearwater Rivers, the latter running through the northern part of the reservation. It was the first capital of the Idaho territory and by 1861 was the population center of the Walla Walla Valley.
In 1890, the neighboring counties to the reservation had substantial amounts of acreage under cultivation. Thus, Nez Perce, Shoshone, and Idaho counties reported 48,339 cultivated acres; the figure for Whitman, Garfield, Columbia, and Asotin counties was 237,558 acres. This indicates that both the market (presumably in Lewiston) and transportation facilities adequately served the area. The Clear-water River was navigable for river transportation for a short distance into the subject area. Rail transportation was available a short distance outside, to the north. There were also wagon trails across the reservation.
The 1893 Agreement gave the Indians first choice through the allotment provision. These allotments, totaling 180,657 acres, were generally scattered throughout the reservation excepting some concentration around the existing Indian settlements in the northwest section of the ceded area. The soil and topographical maps suggest that the Indians chose wisely. About two-thirds of the lands selected by them were in the most favorable land classification. Their selection of the lands in the northwest section might be explained by their proximity to Lewiston and better river transportation. Their selection of the most northwestern plateau lands above the Clearwater River is probably best explained by the fact that the Palouse soil area (apparently the best wheat-growing area) continues south to this plateau and the railroad is closest to this area.
*821 Tlie unallotted or ceded lands were opened to the public on November 18, 1895, and the best lands were taken very quickly. There were 507 homestead filings in the first 13 days following the reservation’s opening. The Agreement of 1893 and the proclamation opening the lands to settlement provided that settlers pay $3.75 per acre for agricultural lands and $5 per acre for stone, timber and mineral lands. 28 Stat. 326, 332. During the first five years 68 percent of the land was taken, and by 1905,10 years after the lands had been opened, 87 percent was taken. A total of 449,160 acres was acquired free under the homestead laws; 14,800 agricultural acres were bought for the statutory $3.75 per acre; 9,320 timber acres were bought for the statutory $5 per acre; 27,200 acres were reserved for state schools; 7,880 acres were retained by the United States for public use or leased for grazing; 4,240 acres were placed in public water reserve; and the remaining 36,400 acres were reserved for miscellaneous uses such as for churches and power sites.
The picture we get, in summary, is that of a large tract of virgin land (about 850 square miles) adaptable to varied uses, the 1894 market value of which was necessarily lowered by its sheer size, the necessity of substantial development expenditures, and its lesser degree of accessibility to markets than other nearby areas. In addition to these negatives, there was the supply and demand factor as such; that is to say, the northern Idaho area, although no doubt relatively populous for a new territory, simply did not have the kind of population growth that exerts a real inflationary bias on land values. Whatever pressure there was to settle new land, and there obviously was some pressure as the very fact of the Nez Perce cession suggests, it was probably deferrable. It is significant to note in this connection that the 1894 valuation date falls at the low point of the so-called “Cleveland Depression.” Farm product prices were markedly affected during this period, so it is reasonable to assume that land values were diminished as well. Such generalities, of course, do not give the answer to the question of fact we must resolve; they are at best common sense guidelines, useful in viewing the evidence to determine whether the value of the *822 cession in 1894 was closer to $4 per acre than it was to $12 per acre.
The principal evidence on valuation is contained in the two appraisal reports and the testimony of the parties’ expert witnesses. Appellant relies on the testimony of William C. Brown, appellee on the testimony of Homer Hoyt. Both appraisers arrived at their ultimate value figures ($11.89 per acre for Brown; $1.29 per acre for Hoyt) primarily by looking to so-called “comparable sales.” In addition, they looked to the topography, soil conditions, transportation availability — to name a few other factors — and have supplied us with a substantial record of maps, photographs, and charts to buttress their conclusions. In evaluating this volume of material, the Commission concentrated on the “comparable sales” in areas proximate to the reservation, and struck a balance between what it considered to' be the extreme positions of the experts. Thus, the Commission observed that appellant’s expert Brown looked to many land transactions with prices exceeding $20' per acre which occurred in well-settled areas where the land was frequently of better quality, transportation was superior, and rainfall was more plentiful. In addition, it noted that many of the sales were of farms which were improved — with fences, buildings, watering facilities — and which had been settled for some years before the valuation date. So it concluded, as did Brown, that these sales would have to be discounted to make them “comparable” to the reservation land. Brown used a 20 percent discount; the Commission obviously used something greater. On the other hand, the Commission observed that appellee’s expert, Hoyt, considered many less sales in his analysis and in many instances looked to distant lands not in any way comparable to the ceded lands. The Commission, in effect, concluded that Hoyt over-discounted the value of the lands which both he and Brown considered, and improperly considered lands beyond the zone of even bare comparability.
We agree with the Commission that Brown was overly optimistic and Hoyt overly pessimistic. We are also in accord with the Commission’s apparent inclination toward Brown’s basic method. However, in concluding that the *823 evidence shows that the land was worth a minimum and not a maximum of $4 per acre, we have viewed the evidence, and particularly the appraisal method used by Brown, somewhat differently from the Commission. Brown’s report shows the average sales price of agricultural lands in the counties in which parts of the ceded tract were located (“tract counties”) to be $15.70 per acre. This was the result of the investigation of 174 sales covering 38,335 acres. Timberland sales averaged $13.38 per acre in these counties and range land $4.54 per acre. For so-called “comparable counties” — i.e., counties neighboring the counties in which parts of the reservation were located — Brown found sales price averages to be somewhat lower than in the tract counties. Averaging the tract county and comparable county figures, he determined that agricultural land in the tract area in 1894 was worth $15.42 per acre, timberland $13.01 per acre, and range land $4.11 per acre. He multiplied these averages by the tract acreage in each of these categories to arrive at a value for the entire half-million acres of $11.89 per acre.
In computing the average sales price figures in the first step above, Brown applied a 20 percent discount to the actual sales price. Stated differently, he discounted the $19.80 per acre average sales price of tract and comparable county agricultural land to $15.42. This discount he felt was necessary to reflect the fact that the $19.80 per acre average included improvements to the land and improvements on the land, e.g., the value of buildings and fixtures, plowing, watering facilities and fencing. In addition, he applied a scale of discounts to arrive at the $19.80, these discounts to take into account the purchasing power of the dollar in the area (i.e., the price index from 1890-1900). We have no quarrel with the latter discounts. We do think, however, that the 20 percent discount may be unrealistically low. Brown went to great effort to document his 20 percent figure, and perhaps so far as it goes it is accurate. We think it should be expanded to cover not just the value of the improvements to the “comparable” land, but also to cover the “real” cost of improving the ceded land. This broadens the concept of discount to make the comparison to the tract county and comparable county lands more meaningful. The topog *824 raphy alone suggests there were substantial barriers to bringing in the labor and material necessary to improve the land to the degree that land was improved on the Palouse plateau which was nearer the railroads and population “centers.” While we cannot supply a precise figure for the proper discount, we think something in the range of 25 percent may better take into account the premium which “improved” land in the other areas could have commanded over the ceded lands.
In addition to the improvement discount, we think the land values in other areas, if they are to be used as the guide here, should be further discounted to take account of the remoteness of the ceded land. Brown made no such discount. Granting that a railroad came within two miles of the northern boundary and that the Clearwater River was regularly navigable at least for a few miles in the northwest part, the topography was such that transportation of wheat, hay, or timber would have been readily accessible in a relatively limited part of the ceded area, and the allotment map suggests that the Indians chose the prime land in the most accessible areas. Accordingly, we feel that a purchaser of the ceded area would have expected to pay some percent less than the price he would have expected to pay for land on the Palouse plateau or near the Snake River, for example— both being areas considered as comparable by Brown. This might have been 20 to 25 percent.
Finally, we note regarding Brown’s method, that he made no discount for size. We think this is an extremely important feature entering into market value. A purchaser of over one-half million acres simply would not pay what 1,000 purchasers of 500 acres each would be willing to pay. Of course, the Indians were in a sense compelled to cede the land, while they might have preferred to sell it piecemeal over a number of years to the hypothetical 1,000 purchasers of 500 acres each. So we are loath to allow the government to get a bargain because it compelled the Indians to cede the land. It is simply the fact, however, that in buying such a large, undeveloped tract, the government undertook the project of dividing and selling the land. Cf. Miami Tribe of Oklahoma v. United States, 9 Ind. Cl. Comm. 1, 17 (1960), *825 aff’d by order, 159 Ct. Cl. 593 (1962). These are expenses the Indians were saved by selling the land as a unit. In addition, by buying the land and holding it pending disposition, the government lost the interest on the amount of the purchase price for the period prior to resale. Any purchaser of a large tract necessarily must take account of the “interest cost” of holding land pending resale. How much of a discount is warranted by the size it is difficult to say. We think, however, that something in the range of 20-25 percent might be reasonable.
By adding together a 25 percent discount for improvements, a 20-25 percent discount for remoteness and inaccessibility, a 20-25 percent discount for size, and applying this to Brown’s “comparable” sales, it is possible to come up with a figure fairly close to $4 — i.e., $20 per acre less 65 to 75 percent equals $5 to $7. This is, of course, the roughest form of estimating. We do not suggest that these discounts either were used by the Commission or should have been. We do not know how it arrived at the conclusion that “a figure as high as $4.00 per acre might be indicated * * * [,] [b]utin no event * * * could [it] have exceeded $4.00 per acre.” In our review of the opinion, findings of fact, and record to determine whether there is substantial evidence to support a $4 figure, we have had to consider what the Commission might have had in mind. We think the discounts, which of course can be conveniently altered to produce a wide spectrum of possible values, are a reasonable approximation of what the Commission did. It should be clear, however, that the discounts we have said might be within a range of reasonableness are in no sense absolutes; they are but steps in analyzing the reasonableness of the Commission’s conclusion in the light of the evidence. Property appraisal is an inexact science at best; this is particularly so when the valuation date is 70 years distant from the appraisal date. So any discounts other than those which can be documented (e.g., Brown’s 20 percent discount for improvements) will necessarily be left to conjecture — the reasonableness of which is largely a matter of common sense.
To reiterate, we think that the $4 per acre figure is supported by substantial evidence. It is, however, at the thresh *826 old, and not at tbe ceiling as tbe Commission determined. We think tbe overwhelming weight of tbe evidence shows that tbe Commission should have found the $4 figure to be the -minimum. In so concluding, we have considered the Brown and Hoyt comparable sales analyses, giving more weight to Brown’s. Since none of the sales were strictly comparable, we have looked to the discounting methods which were used by the appraisers implicitly or explicitly to make the other sales comparable. To Brown’s method of discounting improvements we have added additional discounts for remoteness and size. Also in our thinking has been the effect of the 1894 depression on property values and the effect of the allotments. Finally, we have thought it significant that the 1894 Treaty provided for a sales price of $3.75 per acre for agricultural land and $5 per acre for timberland, and a substantial amount of acreage was bought by settlers after 1894 at these prices. No doubt the government would be entitled to some premium over its purchase price ($2.97 per acre here), but the very size of the premium here suggests that the bargain was too good.
The question then arises as to whether the difference between the $2.97 per acre paid to the Indians and the $4 per acre minimum value is sufficiently large as to be unconscionable under section 2 of the Indian Claims Commission Act. 60 Stat. 1049,1050. In Osage Nation v. United States, 1 Ind. Cl. Comm. 43 (1948), the Commission was called upon to define “unconscionable consideration” as used in the Act. It concluded that the dividing line between what is grossly inadequate consideration and what is merely inadequate was a peculiarly factual question. In affirming the Commission’s approach, this court wrote:
Appellants urge that no showing of actual fraud is required for relief on the grounds of unconscionable consideration. There are cases which seem to support both views, but it appears that only where the inequality of the bargain is very gross, does disparity of price alone justify a conclusion that the consideration was unconscionable. As to what is “very gross,” the courts have provided no exact formula and each case must Toe carefully considered on its own particular facts and circumstances. [Emphasis added.] [119 Ct. Cl. 592, 666, 97 F. Supp. 381, 421, cert. denied, 342 U.S. 896 (1951).]
*827 The “facts and circumstances” inquiry has always been crucial in each case, and there is no ready-made test. Thus, although this court’s cases holding that a particular consideration was unconscionable have involved discrepancies of over 100 percent (the percentage difference between the actual value and the amount paid), there has been no indication that lesser percentage discrepancies are exempt from the challenge of unconscionability. See Sac and Fox Tribe of Indians of Oklahoma v. United States, 167 Ct. Cl. 710, 340 F. 2d 368 (1964), Otoe and Missouria Tribe v. United States, 131 Ct. Cl. 593, 131 F. Supp. 265, cert. denied, 350 U.S. 848 (1955) ; Osage Nation of Indians v. United States, supra. The Commission has, however, taken the strict view that discrepancies considerably less than 100 percent are not unconscionable. In Miami Tribe v. United States, 6 Ind. Cl. Comm. 513 (1958),[6] it held that payment of 63 percent (a 59 percent discrepancy) of the true value was not unconscionable. In the present case it has held that a payment of 75 percent (a 33% percent discrepancy) is not unconscionable. See also Pottawatomie Tribe v. United States, 3 Ind. Cl. Comm. 10, 61 (1954). We think that the Commission has relied too much on the bare percentage discrepancy.
In the present case, inquiry into all the “facts and circumstances” puts the situation in a somewhat different light. Specifically, it is significant to us that the ceded area was comprised of 549,559 acres. The $1.03 difference between the amount paid and the market value multiplied by this acreage totals $566,045.77. Granting that this represents the same 33% percent discrepancy, it has a different taste. Half a million dollars in 1894 was a very substantial sum. When we consider that the Agreement provided that $1,000,-000 of the total $1,626,222 consideration was to be put in trust to earn five percent interest and that it is likely that the $566,045.77 discrepancy would have similarly been put in trust at interest, the discrepancy becomes still more sig *828 nificant. The trust provided that a $50,000 distribution would be made one year after ratification with semi-annual $150,000 distributions thereafter — five percent interest to accrue on the unpaid balance. Agreement of May 1, 1893, Article III, 28 Stat. 326,329. Assuming that the $566,045.77 discrepancy had been put into the trust in 1894, no |>art of it would have been distributed for about five years, and then it would have taken two years to distribute the corpus alone. As a very rough estimate, the interest would have been close to $200,000 for the duration that the discrepancy hypothetically would have been held in trust. When added to the $566,045.77 discrepancy, this interest component raises the percentage discrepancy from 33% percent to about 50 percent.
For purposes of judging whether the consideration was unconscionable, it is also significant that the $4 per acre figure which produces the $566,045.77 discrepancy is a bare minimum. It should be clear from our discussion on the valuation aspect that we think the evidence would support a higher value. Accordingly, although we do not remand the case to the Commission with express instructions to find a higher value, we do feel that it is appropriate to look to some higher, unstated value in resolving the “unconscionable consideration” issue. No doubt the reason for the Commission’s view that the percentage discrepancy is of cardinal importance is that it is impossible to determine a “true” value for land. It is just common sense that some discrepancy, very possibly up to 33% percent, can be expected to result simply from differences in opinion. However, the present case is not the usual situation because we have eliminated one aspect that is typically present in situations in which there are legitimate differences of opinion. This point may be developed by reference to the facts in the present case. The Indians received $2.97 per acre and the land was worth $4 at the very least. Were this a normal real property transaction between a willing buyer and seller, this discrepancy could be explained as resulting from a legitimate difference of opinion or as a good bargain for the buyer and a bad bargain for the seller, but in no sense as an unfair bargain. By concluding that the $4 per acre figure is a bare minimum, *829 however, we have eliminated the aspect of the “legitimate” margin between $2.97 and $4 per acre. That is to say, we believe that no reasonable seller in a willing transaction under any circumstances would have parted with ownership of the ceded area for less than $4 per acre. So on the facts of this case, the “legitimate” margin is not between $2.97 and $4, but between $4 and something greater.
At the risk of being repetitious, we stress that the percentage discrepancy between what the Indians were paid and what the land was worth is not the sole measure of unconscionable consideration. We also stress that we do not depart from our prior position that the price disparity must be “very gross.” We think we are giving effect to both the percentage test and the “very gross” test (which should be substantially identical) in looking to the total discrepancy, to the interest factor, and most importantly to the fact that the $4 per acre value is a bare minimum.
There remains the question of whether the appellant is entitled to interest on its recovery.[7] Appellant now seeks interest on the theory that if the United States had paid an amount equal to the fair market value of the land at the time of the cession, this additional sum would have drawn interest in the same manner and at the same rate as provided for the $1,000,000 held in trust under the Agreement’s Article ITT. 28 S'tat. 326, 329. It is, of course, well established that interest does not run on claims against the United States unless there is an express statutory or contract provision to the contrary or unless there is a showing of delay in payment for lands “taken” in contravention of the Fifth Amendment. 28 U.S. C. § 2516(a) (1964 Ed.). United States v. Alcea Band of Tillamooks, 341 U.S. 48, 49 (1951) ; United States v. Thayer-West Point Hotel, 329 U.S. 585, 588 (1947) ; Cf., Confederated Salish and Kootenai Tribes v. United States, 175 Ct. Cl. 451 (1966), cert. denied, 385 U.S. 921. Thus appellant’s burden here is to show that the Agreement as ratified would have given it five percent interest on the differential amount had it been paid to the trust in 1894. The Agreement is quite *830 specific. Article III, supra, provides that tbe Nez Perce Indians shall be paid $1,626,222 exactly; the $626,222 portion to be paid “to said Indians per capita as soon as practicable after the ratification of this Agreement,” the “remainder of said sum” (equalling $1,000,000) to be held in trust. Earlier in this opinion, we speculated that had the government paid the fair market value in 1894, it probably would have agreed to hold the extra money in trust in the same manner as the $1,000,000. However, that speculation was appropriate only as it related to the question of whether the consideration was unconscionable. In determining whether the Agreement should be read so as to give appellant interest on the difference between the price paid and the fair market value, it is not enough for us to be able to say that probably a larger payment would have been put into the trust. Article III did not make the trust open-ended. It was to receive “the remainder” of a specific sum. What would have happened had the sum been larger it is impossible for us to say. This is not a case like the Pawnee Tribe v. United States, 56 Ct. Cl. 1, 15 (1920), in which this court awarded interest on an amount which the agreement specified but which the United States had for some unknown reason never paid. 21 Stat. 612, 644. The Agreement here specified a sum to bear interest, and that sum apparently was paid and did bear interest; the sum claimed here is over and above the amount specified in the Agreement. In short, the Agreement has reference only to the amount that was actually agreed upon and gives no warrant for reading in a requirement that any sum determined in the future to be the fair market value should bear interest.
Accordingly, the decision of the Indian Claims Commission is reversed, and the case is remanded for further proceedings in conformity with this opinion.
Reversed and remanded.

 13 Ind. Cl. Comm. 184 (April 7, 1964).

 60 Stat. 1049, 1050 (1946). Clauses (S) and (5) of section 2 provide: “The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe * * *: (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, [orj unconscionable consideration * * *; (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity.”

 In a treaty dated June 11, 1855 and ratified on March 8, 1859, a reservation of roughly seven million acres was set aside for the Nez Perce Tribe. 12 Stat. 957-962. The lands in controversy are part of that original reservation.

 13 Ind. Cl. Comm., at 264.

 E.g., Otoe and Missouria Tribe of Indians v. United States, 131 Ct. Cl. 593, 131 F. Supp. 265, cert. denied, 350 U.S. 848 (1955) ; Osage Nation of Indians v. United States, 119 Ct. Cl. 592, 97 F. Supp. 381, cert. denied, 342 U.S. 896 (1951).

 When the decision was appealed, this court found that the Commission had erred in determining the amount of the consideration which the Miami Tribe received for its lands and that this figure amounted to only 38 percent of the true value. 150 Ct Cl. 725 (1960), cert. denied, 366 U.S. 924 (1961). Thus, the court did not reach the question whether payment of 63 percent of value was adequate per se.

 No mention was made of interest in the petition before the Indian Claims Commission. Appellant says, however, that it did assert the claim at the beginning of trial, and all parties have been fully aware of the issue since then.