Durfee, Judge,
delivered the opinion of the court:
The Lummi Tribe of Indians was one of the signatories of the Point Elliott Treaty of January 22, 1855 (12 Stat. 927) which was ratified on March 8,1859. The Indian Claims Commission in 1957 first determined (5 Ind. Cl. Comm. 525) that there had been a taking from the Tribe of a gross area defined within established boundaries (finding 16), later found to consist of 107,500 acres (10 Ind. Cl. Comm. 286) of which the land (excluding the reservation and the bodies of water) amounted to 72,560 acres (finding 19). The Commission also found that “the Lummi Tract as a whole *756 bad a fair market value as of March 8, 1859 of $52,067.00” (finding 80). Neither party then moved for reconsideration of these determinations, nor was any appeal then taken.
Thereafter, the instant suit was consolidated with other Point Elliott Treaty suits “for the limited purpose of determining all issues as to consideration paid or allowable to each petitioner in said cases.” 13 Ind. Cl. Comm. 583, 592 (1964). In that case the Commission found that it was proper to allocate the total monetary consideration for the treaty cession in proportion to the tribal population on the effective date of the Point Elliott Treaty, March 8, 1859 (finding 4). Accordingly, the proportionate amount allocated to plaintiff tribe was found to be $33,634.13 (finding 14).
Subsequently, the Commission found that there was no evidence that the treaty negotiations were unfair or dishonorable under Clause (5) of Section 2 of the Indian Claims Commission Act, 60 Stat. 1049, 1050; 25 U.S.C. §70a; (16 Ind. Cl. Comm. 526).
The Commission decided that the consideration of $33,-634.13 paid to appellant, the Lummi Tribe, under the Point Elliott Treaty for their proportionate share of the total consideration as determined by the Commission, was not unconscionable, within the contemplation of clause (3) of section 2 of the Act, despite the Commission’s previous finding that “the Lummi tract as a whole had a fair market value as of March 8, 1859 of $52,067.00.” 10 Ind. Cl. Comm. 286 (finding 30).
The Commission also decided that there was no justification for revision of the Lummi segment of the Point Elliott Treaty on the ground of unconscionable consideration under the Act, and granted judgment for the Government dismissing the petition. 16 Ind. Cl. Comm. 526 (finding 34.)
Appellant alleges three main points of error by the Indian Claims Commission: (1) insufficient evidence upon which to exclude large portions of land from the area claimed by the Lummi Indians, (2) insufficient evidence upon which to determine the value per acre of the tribal lands, and (3) failure to apply a uniform principle of value estimation as between the Lummi Tribe and its neighboring tribes.
*757 Appellant’s first point is that there is insufficient evidence for the Commission to exclude from the area claimed by the Lummi Tribe large portions thereof, and that the evidence “preponderates in favor of allowing to the Lummi Tribe the east half of San Juan Island, the west half of Lopez Island, Waldron Island, and the area on the mainland to include the area northward to the Town of Semiahmoo near the Canadian border and eastward to a north-south line at least as far as Ferndale, together with all small intervening islands where the Lummi and Swallah operated reef nets.” (Emphasis supplied)
In effect, appellants would have us determine the preponderance of the evidence on a de novo basis, contrary to our jurisdictional limitations under sec. 20(b) of the Indian Claims Commission Act, 25 U.S.C. § 70s, subsection (b) which provides in part:
* * * On said appeal the Court shall determine whether the findings of fact of the Commission are supported by substantial evidence, in which event they shall be conclusive, and also whether the conclusions of law, including any conclusions respecting “fair and honorable dealings”, where applicable, stated by the Commission as a basis for its final determination, are valid and supported by the Commission’s findings of fact. H»
Our court, in describing its limitations under this section of the Act, said:
In passing on this question, it should be emphasized that our responsibility ends when we are satisfied that the findings of the Indian Claims Commission are supported by substantial evidence. That we might have reached a contrary result on the evidence introduced is not the test. * * * United States v. Seminole Nation, 146 Ct. Cl. 171, 180 (1959).
Accordingly, we must first determine whether the findings of the Commission on this point are supported by substantial evidence under the terms of sec. 20(b) of the Act, sufra; not whether the evidence preponderates in favor of appellant’s contention.
Before considering the contentions of the appellant in detail we find it necessary to again advert to what we have re *758 peatedly stated before, and recently in Nooksack Tribe v. United States, 162 Ct. Cl. 712 (1968), cert. denied 875 U.S. 993 (1964) involving the same issues and in the same general area, at pp. 718-719:
* * * We note that appellant has not pointed to any specific findings which it feels is not supported by substantial evidence in the whole record before the Commission. In general, the appellants have based their objection to the ultimate finding of both acreage and value on (1) the fact that the Commission has found larger areas to have been owned by neighboring tribes, and (2) has assigned higher per acre values to the lands involved in the suits brought by those tribes under the Indian Claims Commission Act. This sort of broadside attack on the Commission’s findings and conclusions does not properly represent assignment of error under section 20(b) of the Act. It is not the function of an appellate court to comb the record to discover for itself defects in the findings of fact made by the trial court without any assistance by way of record reference from the appellant, and although in the early appeals from the Commission the court was more inclined to be lenient in this regard, the proper method of objecting to findings of fact has been too often discussed by this court to warrant our going into the matter another time. Fortunately, appellee has analyzed the record before the Commission in its effort to demonstrate the soundness of the Commission’s findings and our review of the record persuades us that the Commission’s findings on both acreage owned and the value as of March 8,1859, are supported by substantial evidence in the record as a whole.
Although appellee has cited this case, the observance of the requirements therein as above enumerated have been honored more in the breach than in the observance thereof by appellant.
We trust that greater credence will be given by counsel to this admonition which was intended to be of help to both counsel and the court.
In 1957 the Commission established the geographical boundaries of the Lummi tract (5 Ind. Cl. Comm. 525, finding 16). In 1962, the gross area embraced by these boundaries was found to be 107,500 acres, including 12,440 acres reserved by the Lummi Tribe as their original reservation under the Point Elliott Treaty (10 Ind. Cl. Comm. 286, finding 19). *759 The net land area, “excluding the reservation,” was found to be 72,560 acres. The appellant submits that in so doing, the Commission excluded 75 percent of the area aboriginally owned by the tribe. To be accepted under the Indian Claims Commission Act, aboriginal title must rest on actual, exclusive and continuous use and occupancy for a long time prior to the loss of the property. Sac. and Fox Tribe of Indians of Oklahoma et al. v. United States, 161 Ct. Cl. 189, 315 F. 2d 896, cert. denied 375 U.S. 921 (1963). Since all of the persons who could have testified as to the extent of the Lummi area from personal knowledge are now dead, most of the evidence, other than documentary, consisted of conflicting testimony by ethnologists for both sides. As we said in Upper Chehalis Tribe et al. v. United States, 140 Ct. Cl. 192, 155 F. Supp. 226 (1957) at p. 196:
* * * it is extremely difficult to establish facts after the lapse of time involved in matters of Indian litigation. In attempting to establish boundaries and occupancy on the basis of fragmentary facts and often uninformed opinions and the work of ethnologists who must of necessity base their conclusions upon much the same information, it becomes necessary to take a common sense approach based upon experience with matters of this nature. * * * Snake or Piute Indians v. United States, 125 Ct. Cl. 241, 254: * * *
The problem of determining the geographical boundaries of the Lummi area is much the same as we considered in Duwamish Indians et al. v. United States, 79 Ct. Cl. 530 (1934), cert. denied 295 U.S. 755 (1935), as to the Muckleshoot Tribes’ claim to a tract in the same general area as the Lummi tract, at p. 604:
Difficult as it has been to trace the genealogy of the Muckleshoots, it is from the record quite clear that at no time has the Government recognized its claimed right of occupancy to the vast acreage claimed. The Indian tribes and bands in this very region were segregated into small entities, their villages were scattered, and the domain over which they roamed shared by too many others to warrant the court in awarding a large money judgment in the absence of positive proof to sustain such a claim.
*760 That the above statement by the court is applicable to the present case as well is apparent from the testimony of the ethnologists for both sides; neither could describe with any particularity the areas utilized by the appellants except as to village areas. The Commission has thoroughly and exhaustively considered all of the evidence in its findings. We conclude that the ultimate finding (No. 16, 5 Ind. Cl. Comm. 525) by the Commission as to the extent of the aboriginal area of the Lummi Tribe is supported ’by substantial evidence.
Appellant contends that the Commission improperly removed the 12,440-acre reservation area (Upper Skagit et al. 13 Ind. Cl. Comm. 583, 588, finding 8) from evaluation of the Lummi acreage, and in effect charged the entire value of this reservation as an offset against the tribe, without evidence of the Lummi’s true interest in the reservation. Appellant alleges that the Commission used tribal allotments on the Tulalip Eeservation in Snohomish Territory as a basis to reach a reservation acreage percentage of 43.3 percent as an offset against the Snohomish Tribe[1] whereas the Lummi Tribe has been charged with the entire value of its reservation as an offset.
According to the same allotment schedules, the Lummi Tribe received approximately 87.39 percent of the allotments in the Lummi reservation. The land within both the Lummi area and reservation was, according to these allotment schedules, occupied predominantly by the Lummi Tribe after the Treaty of Point Elliott. The Commission in the same manner deducted the Suquamish Eeservation lands from the aboriginal area for which the Suquamish were entitled to recover (7 Ind. Cl. Comm. 747), and ruled that the lands in that reservation would not be allocated as consideration. The same action was taken as to the evaluation of the Swihomish and Lower Skagit claims. The Commission concluded that the situation as to the Snohomish Eeservation was different, and that fair treatment to all the Treaty tribes would be achieved by allocating the value of the Snohomish Eeservation lands in the same proportion as the allotments to particular tribal members bore to the total alloted (13 *761 Ind. Cl. Comm. 583). Even if all tbe non-Lnmmi allotments were eliminated in calculating a deduction of tbe Lummi reservation area, tbe increase in total value would be minimal.
We conclude tbe Commission’s determination that tbe Lummi Eeservation acreage should be deducted from their total acreage to be valued, was supported by substantial evidence. When the consideration of $33,634.13 was allocated to the Lummi Tribe for its cession to the United States under tbe Treaty of Point Elliott, the area of tbe reservation was not valued because tbe reservation area was not ceded under tbe treaty.
Tbe Commission’s finding that there was no fraud and there were no unfair or dishonorable dealings by tbe United States of America, is supported by tbe same substantial evidence in tbe same treaty negotiations that we found to be scrupulously conducted in Duwamish et al. v. United States, supra.
However, we find that tbe total consideration of $33,634.13 attributed to tbe Lummi Tribe is unconscionable and that tbe minimum fair market value of tbe land at tbe time of tbe taking was $52,067.00.
The majority opinion of the Commission in Lummi Tribe, 16 Ind. Cl. Comm. 525, relied upon Osage Nation of Indians v. United States, 119 Ct. Cl. 592, 97 F. Supp. 381, cert. denied 342 U.S. 896 (1951), at p. 666:
* * * but it appears that only where tbe inequality of tbe bargain is very gross, does disparity of price alone justify a conclusion that tbe consideration was unconscionable. As to what is “very gross,” the courts have provided no exact formula and each case must be carefully considered on its own particular facts and circumstances.
The Commission then found that the disparity of $18,-432.87 between the attributable consideration of $33,634.13 and the fair market value of $52,067.00 was “comparatively slight” and “the conscience of the Commission remaining un-shocked.” (citing its own language in Nez Perce Tribe v. United States, 13 Ind. Cl. Comm. 184) the Commission concluded that the attributable consideration ought not to be regarded as unconscionable within the contemplation of Clause (3) of sec. 2 of the Indian Claims Commission Act.
*762 The Nez Perce Tribe decision, of the Indian Claims Commission, supra, has since been reviewed by this court in 176 Ct. Cl. 815 (1966), cert. denied 386 U.S. 984 (1967).
In determining that the consideration paid the Nez Perce Tribe was unconscionable, this court said: “We are of the view that there is substantial evidence in the record indicating a value of $4 per acre, but unlike the Commission, we think this is a minimum figure.” We there held that the difference between the $2.97 paid to the Tribe and the $4 per acre found to be the minimum fair market value was sufficiently large to be unconscionable under the Act. The court said, at p. 827:
The “facts and circumstances” inquiry has always been crucial in each case, and there is no ready-made test. Thus, although this court’s cases holding that a particular consideration was unconscionable have involved discrepancies of over 100 percent (the percentage difference between the actual value and the amount paid), there has been no indication that lesser percentage discrepancies are exempt from the challenge of unconscionability. See Sac and Fox Tribe of Indians of Oklahoma v. United States, 167 Ct. Cl. 710, 340 F. 2d 368 (1964), Otoe and Missouria Tribe v. United States, 131 Ct. Cl. 593, 131 F. Supp. 265, cert. denied, 350 U.S. 848 (1955); Osage Nation of Indians v. United States, supra. The Commission has, however, taken the strict mew that discrepancies considerably less than 100 percent are not unconscionable. In Miami Tribe v. United States, 6 Ind. Cl. Comm. 513 (1958), it held that payment of 63 percent (a 59 percent discrepancy) of the true value was not unconscionable. In the present case it has held that a payment of 75 percent (a 33ys percent discrepancy) is not unconscionable. See also Pottawatomie Tribe v. United States, 3 Ind. Cl. Comm. 10, 61 (1954). We think that the Commission has relied too much on the bare percentage discrepancy. [Emphasis supplied]
Although Commissioner Scott concurred in the Commission’s decision now before us in the Lummi case, he stated :
My personal conscience as to the relationship of our valuation of $52,067.00 for the Lummi lands to the consideration of $33,634.13 would permit recovery of the difference to the tribe. For example, the difference is *763 $18,432.87, which, if it had been paid at treaty time in 1859 when the value of the dollar was much greater, it would no doubt have been of great assistance to the Lummi Indians. That amount of money in 1859 would have made possible substantial assistance to these good people. If it had been deposited in the U.S. Treasury at that time with four percent simple interest per annum of $737.31 and left for the ensuing 107 years, the accumulated interest would equal $78,892.17 which, with the principal sum, would equal $97,325.04 in today’s dollars or expressed in another way, $44,258.04 more than the total valuation we have placed on these lands.
Similar circumstances were considered as relevant by this court in Nez Perce Tribe, supra, at p. 828:
* * * Assuming that the $566,045.77 discrepancy had been put into the trust in 1894, no part of it would have been distributed for about five years, and then it would have taken two years to distribute the corpus alone. As a very rough estimate, the interest would have been close to $200,000 for the duration that the discrepancy hypothetically would have been held in trust. When added to the $566,045.77 discrepancy, this interest component raises the percentage discrepancy from 33% percent to about 50 percent.
Although we cannot include interest on the difference between consideration and value in our judgment, unless the taking was in violation of the Fifth Amendment to the Constitution, we can consider the interest referred to by Commissioner Scott, supra, as a factor in determining whether the consideration was unconscionable. Nez Perce Tribe of Indians, supra, at p. 829:
At the risk of being repetitious, we stress that the percentage discrepancy between what the Indians were paid and what the land was worth is not the sole measure of unconscionable consideration. We also stress that we do not depart from our prior position that the price disparity must be “very gross.” We think we are giving effect to both the percentage test and the “very gross” test (which should be substantially identical) in looking to the total discrepancy, to the mterest factor, and most importantly to the fact that the $4 per acre value is a bare minimum. [Emphasis supplied]
*764 Referring to the disparity in the Lv/mnm case, the Commission said:
“In the case at bar, the attributable consideration— $33,634.13 amounts to about 65% of the fair market value of $52,067.00. Far from “very gross” the disparity is comparatively slight. * * * ” [Emphasis supplied]
Although the difference in dollars between the treaty consideration attributed to the Lummi Tribe and the fair market value is found by the Commission to be much less than the difference in the Nez Perce Tribe case, ($18,432.87 compared to $566,045.77), the proportionate disparity is about the same in each case. The Lummi Tribe consideration was 65 percent of fair market value, and the Nez Perce Tribe consideration was 66% percent.
The court pointed out in Nez Perce Tribe, supra, that the disparity of half a million dollars in 1894 “was a very substantial sum” (for 1829 tribal members). The Lummi disparity of $18,432.87 in 1859 was likewise a very substantial sum for a small tribe of about 450 members. As Commissioner Scott said, “It would no doubt have been of great assistance to the Lummi Indians.”
In determining whether the disparity between consideration and fair market value of ceded Indian lands was unconscionable, this court has also considered the relative treaty bargaining abilities of the Indians and the United States as significant. In Osage Nation of Indians v. United States, supra, the court said, at pp. 666 and 667:
* * * If these Indians had been more versed in the ways of “civilization” or had been represented, as were some other tribes, by astute white attorneys, it would have been impossible to seriously suggest that 34 cents an acre was a fair price for this land. In this case we are convinced from the record that the agents acting for the United States in the negotiation of this treaty had, both in 1863 and subsequently, knowledge of facts bearing upon the value of this land that was not known by the Osage, and this fact, coupled with the very low price placed upon the land by those agents, results in unconscionable consideration having been paid the Osage for the land embraced in Article 1 of their treaty.
*765 In this regard, Commissioner Scott was also deeply concerned in the present case:
_ In this matter, as in most of those involving treaty cessions of Indian lands to the United States, it was the defendant which sought the transaction; and, although we find no fraud or unfair and dishonorable dealings, the fact that the United States was the moving active party in bringing about the conferences and dealings with the Indians, in which the parties were not of equal bargaining ability, is another factor which disturbs my personal conscience.
* * * Certainly, the Indians had no training in arriving at such valuations. The representatives of the United States, on the other hand, were men of ability, serving high positions of trust. * * *
We likewise find no fraud or unfair and dishonorable dealings. However, in finding that the Lummi consideration was unconscionable, one of the additional factors that we consider to be of significance is the unequal position and bargaining ability of the parties to the treaty, just as we considered the significance of this factor in Osage Nation of Indians, supra. It is a factor in this case that affects us much as it affected Commissioner Scott when he stated, “it disturbs my personal conscience.”
However, we give greater effect to what we considered as most important in considering valuation of the treaty ceded lands in Nez Perce Tribe, supra, and this is the fact that the fair market value of $52,067.00 found by the Commission for the Lummi lands is a bare minimum.
The Commission, in the absence of evidence of fair market value, took into consideration other criteria for determining the value of the ceded lands, as stated by this court in Otoe and Missouria Tribe of Indians, supra, at 683-634:
* * * This method of valuation takes into consideration whatever sales of neighboring lands are of record. It considers the natural resources of the land ceded, including its climate, vegetation, including timber, game and wildlife, mineral resources and whether they are of economic value at the time of cession, or merely of potential value, water power, its then or potential use, markets and transportation — considering the ready markets at that time and the potential market. * * *
*766 The Commission concluded that “the highest and best uses for the Lummi tract as a whole would have been for lumbering and limited coal mining.”
Due to the moderating influences of the Pacific Ocean, the winters were mild and the summers cool, with an abundance of rain except during July and August. Of the total Lummi land area of 72,560 acres, the net land area of the mainland was found to be 25,647 acres. Fourteen percent of this area was located in the low flat alluvial plains of the Noobsack Eiver and its tributaries, and was largely arable land suitable for agriculture in an excellent climate. The rest of the area was described by the Commission:
The original cover of the mainland portion of the Lummi tract consisted of a band of heavy, dense timber which, save for a few small openings and valleys, covered the entire area west of the Cascade Mountains. About seven eighths of this timber was Douglas Fir, also known as red fir. The remainder included red cedar and hemlock. The mainland timber on this tract was comparatively accessible, even with the crude lumbering techniques then available, because well over half of the mainland timber acreage was within one and one-half miles of navigable water and the remaining mainland timber acreage which was not far beyond the one and one-half mile mark was secondarily accessible.
The Commission found that “the Lummi tract was comparatively inaccessible to settlers before and long after the valuation date because of the complete absence of roads or railroads.” For the Commission to downgrade the fair market value of this land for inaccessibility to settlers because of the complete absence of roads or railroads in 1859, when there were no railroads or other roads to speak of anywhere else in this territory, cannot be supported by substantial evidence. On the contrary, the Lummi tract was readily accessible for settlers, lumbering and mining operations by the existing and active commercial intercourse by vessels using the navigable waters in the Puget Sound area. There was a substantial and steadily increasing demand for Puget Sound timber and for coal prior to 1861. By 1859, there were twenty-four sawmills in this area, including one built in 1852 in the Lummi tract, and a producing coal mine. Despite the Commission’s con- *767 elusions as to the comparative inaccessibility for settlement within twenty years from the effective date of the treaty, about 45 percent of the tract’s total land acreage had passed into private ownership. This was seven years before the Northern Pacific Railroad reached the Puget Sound area in 1887. Obviously, the area was readily accessible for settlement despite the absence of a railroad.
Timberland acreage in the area sold for $1.05 to $1.50 per acre in 1861, 1862 and 1863, and by 1900, for $6.00 per acre. The Lummi mainland timber of over 20,000 acres averaged about ten thousand board feet of timber per acre, of heavy dense timber, seven eighths of which was Douglas Fir. The Government set the stumpage fee for timber cut on Governmental land at $2.50 per thousand. Accordingly, it appears that the 1859 fair market value of the timber on over 20,000 acres of mainland timberland taken alone was about as much as the total consideration of $33,634.13 apportioned to the Lummi Tribe. Certainly, the 14 percent balance of the mainland, consisting of about 5,000 acres of arable land on the alluvial plains in an excellent growing climate were of considerable potential value for agriculture, even though the use of this land for farming in 1859 was almost entirely for the subsistence of the settlers.
The two-thirds remainder of about 45,000 land acres was located on three islands, and was as equally accessible as the mainland to the commercial intercourse with the remainder of the Puget Sound area and the California coast by the vessels then using the adjoining navigable waters on the west and south. Oreas Island alone was 36,390 acres in area, over 11,000 acres larger than the mainland area, with large stands of timber and large acres of farm land and pasturage, despite the fact that large portions of the island areas were hilly to mountainous.
As of the valuation date, it was known that the Lummi lands included mineral lands and settlement of the tract began in 1851 with lignite coal mining operations. There was a ready market for this coal in San Francisco, to which it was freighted by water. A coal mine was sold for $18,000 on or about the valuation date, and was operated profitably until *768 1878 when it was flooded and abandoned. Although the Commission concluded that the highest and best uses of the Lummi tract as a whole were timber and coal production, it gave scant if any consideration to the value of the coal lands as far as we can ascertain from its findings, and we find no attempt to appraise the value of the farm and pasture land.
Accordingly, we conclude that the value of the Lummi tract at $52,067.00, as determined by the Indian Claims Commission, was the bare minimum fair market value of this tract on March 8,1859, the effective date of the Point Elliott Treaty of 1855. The consideration of $33,634.13 for the Lummi tract was unconscionable within the contemplation of the 'Indian Claims Commission Act. In considering the total discrepancy between the consideration and the fair market value in concluding that this consideration was unconscionable, we look most importantly to the fact that the value of $52,067.00 “is a bare minimum.” Nez Perce Tribe of Indians, supra.
Accordingly, the decision of the Indian Claims Commission is reversed, and the case is remanded for further proceedings in conformity with this opinion.
Collins, Judge, took no part in the decision of this case.

Reversed and Remanded.

 Upper Skagit Tribe et al. v. United States, 13 Ind. Cl. Comm. 583, 590 (1964).