UNITED STATES

v.

The KIOWA, COMANCHE AND APACHE TRIBES OF INDIANS.

No. 3-57.

United States Court of Claims.
July 16, 1958.

W. Braxton Miller, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for appellant, United States. Ralph A. Barney, Washington, D. C., was on the briefs.

J. Roy Thompson, Jr., Washington, D. C., for cross appellant, Kiowa, Comanche and Apache Tribes of Indians, Wm. C. Lewis and Frank Miskovsky, Oklahoma City, Okl., were on the brief.

LITTLETON, Judge.

This is an appeal by the United States from a final determination of the Indian Claims Commission in Docket No. 32, dated March 12, 1957, as amended, on July 18, 1957, in which the Commission, after making findings of fact and rendering an opinion, held that the United States was liable to the petitioners for the difference between the value of certain land and the price paid to petitioners therefor. The Government takes the position that the Commission erred as a matter of law in finding that the United States was liable to the petitioners under the circumstances of this case; that the Commission's findings of fact on the issue of value are either inadequate or not supported by substantial evidence on the record as a whole, and that the Commission erred as a matter of fact and law in disallowing all offsets claimed by the United States.

The Kiowa, Comanche and Apache Tribes of Indians, petitioners below, have filed a notice of cross appeal urging that the Commission erred in finding too low a value per acre for the land acquired by the United States in 1900, and that the Commission erred as a matter of law when it did not allow interest from June 6, 1900, on its award of $2,067,166.

In order to avoid confusion in discussing the contentions of the parties to the cross appeals herein, we shall identify them as the Government and the Indians, respectively.

The original decision on the question of the Government's liability to the Indians in this case was rendered by the

Indian Claims Commission on April 9, 1951 (1 Ind.Cl.Comm. 520, 528). The claim was asserted under Section 2 of the Indian Claims Commission Act, 60 Stat. 1049, 25 U.S.C.A. § 70a, on the ground that it was a claim which would arise if the so-called Jerome Agreement (authorized by Section 14 of the Act of March 2, 1889, 25 Stat. 980, 1005) were revised on the grounds of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or, in the alternative, that it is a claim based upon fair and honorable dealings. In its original findings and decision on the issue of liability, the Indian Claims Commission concluded that it did not need to determine whether or not the Jerome Agreement was obtained by fraud, duress, mistake, or was based upon unconscionable consideration because, in the opinion of the Commission, under ordinary principles of contract law the United States became liable to respond in damages for breach of its contract with the Indians. Although the reasoning of the Commission on this point appears to be somewhat obscure in view of the fact that under the circumstances as outlined by the Commission there appears to have been no contract executed by the parties, we are of the opinion that the Commission has reached the correct result either because the Government was liable under a contract implied in fact (there having been no valid ratification by Congress of the 1892 Jerome Agreement), or because its conduct in connection with this matter did not comport with fair and honorable dealings.

Under the Treaty of October 21, 1867, 15 Stat. 581, 582, the United States ceded certain lands located in the state of Oklahoma to the Confederated Tribes of Kiowa and Comanche Indians described therein as follows:

"commencing at a point where the Washita river crosses the 98th meridian, west from Greenwich; thence up the Washita river, in the middle of the main channel thereof, to a point thirty miles, by river, west of Fort Cobb, as now established; thence, due west to the north fork of Red river, provided said line strikes said river east of the one hundredth meridian of west longitude; if not, then only to said meridian line, and thence south, on said meridian line, to the said north fork of Red river; thence down said north fork, in the middle of the main channel thereof, from the point where it may be first intersected by the lines above described, to the main Red river; thence down said river, in the middle of the main channel thereof to its intersection with the ninety-eighth meridian of longitude west from Greenwich; thence north, on said meridian line, to the place of beginning, * * * "

By a separate treaty the Apache Tribe of Indians was incorporated with the Kiowa and Comanche Tribes of Indians and became entitled to share in the benefits of the above described Reservation, 15 Stat. 589. Article XII of the Treaty of October 21, 1867, supra, (known as the Medicine Lodge Treaty) provided as follows:

"No treaty for the cession of any portion or part of the reservation herein described, which may be held in common, shall be of any validity or force as against the said Indians, unless executed and signed by at least three fourths of all the adult male Indians occupying the same, and no cession by the tribe shall be understood or construed in such manner as to deprive, without his consent, any individual member of the tribe of his rights to any tract of land selected by him as provided in Article III [VI] of this treaty."

Pursuant to section 14 of the Act of March 2, 1889, 25 Stat. 980, 1005, the President of the United States appointed a Commission comprised of David H. Jerome, as Chairman, Warren G. Sayre, and Alfred M. Wilson, to negotiate an agreement with the Indians for the cession of their land described in the 1867 Treaty. The Commissioners ultimately

negotiated such an agreement on the 6th day of October 1892, which agreement became known as the Jerome Agreement. The Agreement contained a provision that it would become effective *only* when ratified by the Congress of the United States. On October 22, 1892, the United States Commissioners transmitted the Agreement to the President, who in turn reported the Agreement to the Congress. There was apparently a good deal of dissatisfaction among the members of the Indian tribes with respect to the terms of the Agreement and the manner of its procurement, which dissatisfaction was communicated to officials in Washington from time to time. Congress took no action with respect to the Jerome Agreement until it passed the Act of June 6, 1900, 31 Stat. 672, 676. That Act was entitled "An Act to ratify an agreement with the Indians of the Fort Hall Indian Reservation in Idaho, and making appropriations to carry the same into effect." Section VI of that Act purported to quote verbatim and to ratify the Jerome Agreement made with the Kiowa, Comanche and Apache Indians in 1892. However, the so-called ratification contained in the Act of June 6, 1900,[1] made a number of changes in the terms agreed to by the Indians and the Commissioners in the Jerome Agreement and such changes were never resubmitted to the Indians for acceptance or rejection as required by Article XII of the Treaty of October 21, 1867, quoted above. One of the changes made in 1900 concerned the classification of lands. The Jerome Agreement had provided that the land in the reservation should be classified as grain-growing land or as grazing land and that in making selection of the lands to be allotted in severalty, as provided elsewhere in the Agreement, each Indian should be required to take at least one-half of his or her allotment in land classified as grazing land. This provision was eliminated from the 1900 ratification and in its place Congress provided that the Secretary of the Interior should set aside for the use in common of the tribes 480,000 acres of grazing land to be selected by the Secretary of the Interior either in one or more tracts as should best subserve the interests of the Indians. As pointed out by the Indians, they were entitled under the Jerome Agreement to have their lands classified into grain-growing and grazing lands as an aid in making their selections. Whether, as contended by the Government, the change made in 1900 ultimately worked to the benefit of the Indians, or whether it did not, the fact remains that the ratification of the Jerome Agreement was not in the terms of the original Agreement agreed to by the Indians and the United States Commissioners.

The Jerome Agreement also provided that the Indians were to receive $2,000,000 for their surplus lands to be paid for as follows: $200,000 in cash to be distributed per capita within 120 days after ratification of the Agreement; $200,000 to be paid under direction of the Secretary of the Interior, one year after the first payment; $100,000 to be paid one year following the second payment; interest at the rate of 5 percent on the remaining $1,500,000 was to be paid to the Indians per capita annually. In the 1900 ratification of the Jerome Agreement Congress provided that $500,000 was to be distributed per capita at such times and in such manner as the Secretary of the Interior should deem to be for the best interests of the Indians. The 1900 legislation then provided that interest on the remaining $1,500,000 was to be paid to the Indians per capita annually only in the event that the Indians were successful in defending a lawsuit which Congress had authorized the Choctaw and Chickasaw Nations to bring in the Court of Claims to

1. The terms of the ratifying legislation were further changed by the Act of January 4, 1901, 31 Stat. 727, the Act of March 3, 1901, 31 Stat. 1078 and the Act of March 3, 1901, 31 Stat. 1093 in which Congress, among other things, extended the time for making allotments and the opening of the surplus land to settlement.

determine the rights of such Nations to a reversionary interest in the unallotted lands.

The Act of 1900 eliminated the name of the Indian agent and that of an Army officer which the Indians and the United States had agreed under the Jerome Agreement should be beneficiaries of that Agreement.

The Jerome Agreement had provided that sections 16 and 36 in each township should be withheld from allotment. The Act of 1900 provided that sections 13 and 33 of each township on the reservation should be withheld from allotment in addition to sections 16 and 36. Thus the 1900 legislation doubled the amount of land withheld from allotment. Although under the 1900 legislation individual Indians would still receive the amount of land as individual allotments guaranteed to them by the Jerome Agreement, the withholding of the additional sections from allotment might well have prevented family units from making selections of contiguous lands.

The 1900 legislation also provided that if the allotted lands contained minerals they should be open to location and entry under the mining laws of the United States. Despite the fact that this provision was never enforced, its inclusion in the 1900 legislation represented a material change in the Jerome Agreement.

 We are of the opinion that the Indian Claims Commission was correct in ruling that Congress did not actually ratify the Jerome Agreement, which was in essence a contract between the Indians and the United States, because it was accepted in terms varying materially from the offer. The Government urges that the Indians are estopped from making such an argument because for years subsequent to the passage of the 1900 legislation the Indians *elected* to live within the terms of the 1900 law. As a matter of fact, the Indians did everything they could to escape the terms of the 1900 legislation. See Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299. As this court pointed out in

Sioux Tribe of Indians of Lower Brule Reservation, S. D. v. United States, 111 F.Supp. 766, 125 Ct.Cl. 439, 443, the doctrine of acquiescence is hardly applicable to a dependent Indian tribe. Moore v. United States, 32 Ct.Cl. 593, relied on by the United States, is distinguishable in that the Sioux Tribe in that case consented to the changes made by the Congress, and, along with the United States, regarded the unproclaimed treaty as being in effect. Furthermore, the Moore case was concerned with the rights of a white citizen of the United States to collect for an Indian depredation alleged to have been committed by the Sioux Tribe, and the court held that under the circumstances of that case the United States could not complain that the treaty was ineffective merely because it had not been proclaimed.

 The Commission held that the Indians herein are entitled to recover the difference between the value of the land acquired by the United States on June 5, 1900, and the purchase price paid therefor on that date. We are of the opinion that the Commission was correct in so holding either on the ground that the Indians are entitled to the fair market value of the land as damages for breach of a contract implied in fact, or as a measure of their recovery on the grounds of fair and honorable dealings. It would be helpful to the court, and perhaps to the parties, if the Commission would phrase its holdings on liability in the terms of section 2 of the Indian Claims Commission Act.

On the question of the amount of recovery, the Commission found that the land acquired by the United States in 1900 was worth on an average $2 per acre, whereas the Indians were paid approximately 98.3 cents per acre. In their cross appeal the Indians urged that the evidence of record would support a valuation of $3.45 per acre, but the Indians concede that they are unable to show that the Commission's finding of $2 per acre is not supported by substantial evidence. The Government, on the other hand, urges that the Commission's findings are

not supported by substantial evidence on the record as a whole and that the findings are not sufficiently basic and detailed to meet the tests laid down by this court in Snake or Piute Indians of Former Malheur Reservation in Or. v. United States, 112 F.Supp. 543, 125 Ct. Cl. 241.

██ The record on valuation in the instant case is voluminous and represents careful and exhaustive preparation by the Indians and by the Government. Following the criteria suggested by this court in its decisions in Rogue River Tribe of Indians v. United States, 89 F. Supp. 798, 116 Ct.Cl. 454; certiorari denied 341 U.S. 902, 71 S.Ct. 610, 95 L.Ed. 1342, and in Alcea Band of Tillamooks v. United States, 87 F.Supp. 938, 115 Ct.Cl. 463, reversed on the matter of interest only, United States v. Alcea Band, etc., 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738, the Indian Claims Commission appears to have carefully analyzed the record on valuation and made sufficiently detailed primary findings to adequately reflect that record and to fully support the ultimate finding of $2 an acre for the land in question. We are of the opinion that the findings on valuation are an adequate and accurate reflection of the evidence produced by the parties; that the burden of selecting from the conflicting evidence material upon which to base findings of fact has been admirably borne by the Commission and that its findings are supported by substantial evidence on the record as a whole and are therefore binding upon this court. The primary objection which the Government appears to have to the Commission's findings is that the Commission relied on some portions of the evidence rather than upon others. The choice which the Commission must make in a case such as this is not a simple one, but we are of the opinion that the choice it has made in each instance was the proper one.

█ On the matter of offsets the Commission finally concluded that the Government had not succeeded in establishing any allowable offsets. The evidence submitted by the Government in support of its claim of offsets consisted of the usual voluminous report of the General Accounting Office. In accordance with the expressions of this court in Quapaw Tribe of Indians v. United States, 120 F.Supp. 283, 128 Ct.Cl. 45, the Indian Claims Commission has made a careful analysis of the reports of the General Accounting Office and has concluded, with respect to some of the offsets, that the United States had failed to sustain the burden of proof necessary to show that the expenditures actually were made for the benefit of the tribe. In other instances, the Commission has held that the amounts expended were for the benefit of individual Indians rather than for the benefit of the tribe and were therefore not allowable as offsets against a judgment for the tribe on a tribal claim. Although the Government argues that the Commission was supplied with a second report from the General Accounting Office purportedly revised to supply facts held by this court to be essential in the Quapaw case, supra, the Report is not conclusive and the issue of whether or not such facts have been supplied as would support the allowance of an offset, is a matter for the judicial determination of the Indian Claims Commission. The Commission has made numerous detailed findings relative to the proof of offsets. Those findings adequately reflect the record on this matter and are supported by substantial evidence. In its opinion of March 12, 1957 (5 In.Cl. Comm. 96), the Commission has carefully considered each item of offset claimed and, in our opinion, has correctly ruled against the allowance of any of the offsets.

█ On the matter of interest, the Indians urge that the Commission erred in not allowing interest as a part of the award. The Indians contend that although Congress had the power to take the surplus lands in question, Congress did not have the power to pay the Indians less than just compensation for the land which it took. The Indians concede that under the holding of the Supreme Court in Lone Wolf v. Hitchcock, supra,

the acquisition by the United States of the land in question did not amount to a taking in the constitutional sense because of the plenary power of Congress over tribal relations of the Indians and over Indian tribal property. The Court held that the Act of June 6, 1900 was merely the exercise of such Congressional plenary power. While, as pointed out by the Indians, it is difficult to distinguish between an act of Congress which passes title to Indian land without the consent of the tribal owners and for no consideration, and an act of Congress which passes title to Indian land without the consent of the owners for only a portion of its true value at the time of acquisition, we think that the issue regarding the allowability of interest is not actually before the court in this appeal. The petition of the Indians before the Indian Claims Commission does not state a claim arising under the Constitution, but rather a claim which would result if the Jerome Agreement were revised on the grounds of fraud, duress, unconscionable consideration, mutual or unilateral mistake; and a claim based upon fair and honorable dealings. This court has held that awards rendered on claims arising under those portions of section 2 of the Indian Claims Commission Act do not bear interest. Osage Nation of Indians v. United States, 97 F.Supp. 381, 119 Ct. Cl. 592, 671. The same is true of a claim under a contract, which falls under that portion of section 2 of the Act providing for "all other claims in law or equity * * * with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; * * * ".

The final determination and award of the Indian Claims Commission in favor of the Indians, petitioners below, is affirmed.

. It is so ordered.

JONES, C. J., and LARAMORE, MADDEN and WHITAKER, JJ., concur.