## CADDO TRIBE OF OKLAHOMA et al.

### v.

### The UNITED STATES.

### No. 226.

United States Court of Claims.

Jan. 23, 1980.

Marvin J. Sonosky, Washington, D. C., for plaintiffs. Rodney J. Edwards, Duluth, Minn., attorney of record. William R. Perry, Sonosky, Chambers & Sachse, Washington, D. C., of counsel.

Bernard M. Sisson, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and DAVIS and SMITH, Judges.

### OPINION

PER CURIAM: *

This case was originally filed with the Indian Claims Commission on August 8, 1951, under the Indian Claims Commission Act, the Act of August 13, 1946 (25 U.S.C. § 70 *et seq.* (1976)). It was transferred by the Commission to the Court of Claims on June 13, 1978, pursuant to section 23 of the 1946 act, as amended (25 U.S.C. § 70v (1976)).

As explained subsequently in the opinion, some of the plaintiffs' claims were disposed of by the Commission prior to the transfer of the case to the court. Other claims were still pending before the Commission at the time of the transfer.

Following the transfer of the case to the court, the parties filed two motions that gave rise to the present proceeding.

The first of these motions, entitled "Motion to Establish Date of Value," was filed by the defendant on July 18, 1978. The plaintiffs on November 1, 1978, filed a response in the form of a document entitled "Plaintiffs' Motion to Establish Dates of

---

* This opinion incorporates the opinion of Trial Judge Mastin G. White, with minor modifications and the omission of one point which the court finds it need not reach. The necessary findings of fact are contained in this opinion.

Valuation and Opposition to Defendant's Motion for a Date of Value," together with a supporting memorandum. Thereafter, the defendant on December 4, 1978, filed a memorandum replying to the plaintiffs' response of November 1, 1978.[1] Finally, on January 18, 1979, the plaintiffs filed a reply to the defendant's memorandum of December 4, 1978.

The two motions relate to the valuation of certain lands which are located in what is now the State of Oklahoma and which are often referred to by the parties as the surplus unallotted lands of the Wichita Reservation.

To the extent that the pending motions ask the court to determine at this time the proper date or dates for the valuation of the lands involved in the motions, they are allowed. It would not be feasible for the parties to engage experts and otherwise prepare for a trial on valuation without first knowing the date or dates toward which their valuation evidence should be directed.

So that the issue as to the date or dates of valuation may be placed in a posture conforming to the rules of the court, it appears that such issue should be separated from the other issues in the case pursuant to Rule 131(b) for early consideration and determination, and it is so ordered. As the parties rely on the record heretofore made before the Indian Claims Commission, no actual trial for the reception of additional evidence on the issue as to the date or dates of valuation is necessary.

### Background Information

By way of background, it should be stated that the Caddo Tribe of Oklahoma is an incorporated Indian tribe, having been chartered by the Secretary of the Interior pursuant to section 3 of the act of June 26, 1936 (25 U.S.C. § 503 (1976)). The members of the tribe are modern-day descendants of a group of confederated Indian tribes which were collectively known as "the Caddo" (or "the Caddoes") and which, at one time, occupied a large territory in what is now northwestern Louisiana, southwestern Arkansas, southeastern Oklahoma, and eastern Texas. Because of a severe epidemic in about 1777 and the ravages of warfare with their northern neighbors, the Osages, in the late 1700's, the Caddo were substantially reduced in number and in power, so that, by 1800, they were confined mainly to a comparatively small area in what is now northwestern Louisiana and southwestern Arkansas.

The main body of the Caddo came under the jurisdiction of the United States for the first time as a result of the Louisiana Purchase in 1803.[2] Following negotiations, a treaty was entered into on July 1, 1835, between the Caddo chiefs and a commissioner appointed by the Secretary of War. Under the treaty (7 Stat. 470), the Caddo ceded to the United States the lands which they were then occupying in northwestern Louisiana and southwestern Arkansas, totaling 636,321.25 acres and now comprising Caddo Parish in Louisiana and Miller County in Arkansas. The consideration for the ceded land under the treaty was $80,000 in money and goods.

After the signing of the treaty in 1835, the Caddo who had been occupying the ceded lands left such lands and moved out of the United States into what is now eastern Texas and was then Mexican territory. In 1836, the area then occupied by the Caddo became part of the Republic of Texas, when Texas gained its independence from Mexico. Then, in 1845, the area became part of the United States, upon the annexation of Texas by the United States.

Following the admission of Texas into the Union, the United States on May 15, 1846, concluded a treaty (9 Stat. 844) with the Caddo and other Texas Indians. Under this treaty, the Indian tribes agreed that they

[1] The defendant's memorandum also supported "Defendant's Motion for a Trial on Liability," which was filed on December 4, 1978, and allowed on January 3, 1979.

[2] There were some Caddo in what is now eastern Texas who did not come under the jurisdiction of the United States until 1845, as subsequently indicated.

would acknowledge themselves as being under the protection of the United States, and that the United States would have the sole and exclusive right of regulating trade and commerce with them.

In 1853, the Texas Legislature authorized the United States to establish an Indian reservation on state-owned vacant lands (upon its admission into the Union, Texas retained the ownership of all public lands within the State). The next year, in 1854, an Indian reservation was established on the Brazos River near Waco, Texas; and the Caddo moved from eastern Texas into the Brazos River Reservation, which they occupied along with other Indian tribes.

Because of hostility on the part of white settlers in the area, the Indians on the Brazos River Reservation and the Government subsequently agreed that the Indians would be moved from Texas to a site on the Washita (or Ouachita) River in the Indian Territory (now part of the State of Oklahoma). In accordance with this agreement, the Caddo moved to the Indian Territory in 1859. They and other Indian tribes from Texas were settled on an area of land that was commonly referred to as the Wichita Reservation (although it was not officially so designated). This was part of a large district which the United States had previously leased from the Choctaw and Chickasaw Nations for the permanent relocation and settlement of other Indian tribes. Later, in 1866, the Choctaws and Chickasaws released all of their interests in the leased district.

For some years, the Indian tribes on the wichita Reservation, including the Caddo, were generally known as "the Wichita and affiliated bands of Indians."

On June 4, 1891, the Wichita and affiliated bands of Indians (including the Caddo) entered into an agreement with David H. Jerome and two other commissioners acting for the United States. This agreement, which is often referred to as "the Jerome agreement," will be discussed at some length later in the opinion. For the present, it should suffice to say that, in the agreement, the Wichita and affiliated bands of Indians ceded to the United States "all their claim, title and interest in and to the lands" comprising the Wichita Reservation; that each individual Indian was to receive, out of such lands, an allotment of 160 acres; that with respect to the ceded lands not needed to satisfy the 160-acre allotments to individual Indians, the agreement provided that "the question as to what sum of money, if any, shall be paid to * * * [the Wichita and affiliated bands of Indians for the possessory right claimed by them in] such surplus lands shall be submitted to the Congress of the United States, the decision of Congress thereon to be final and binding upon said Indians"; and that the agreement declared that it would "have effect whenever it shall be ratified by the Congress of the United States."

The Jerome agreement was dealt with by Congress in the act of March 2, 1895 (28 Stat. 876, 894–99). This statute declared that the Jerome agreement was "accepted, ratified, and confirmed," subject to certain provisions that will be discussed later in the opinion.

### The Litigation

As stated earlier in the opinion, this case was originally filed with the Indian Claims Commission on August 8, 1951, under the act of August 13, 1946 (25 U.S.C. § 70 et seq. (1976)). The complaint contained six counts.

Count I was based on the treaty of July 1, 1835, and alleged that the payment which the Government made to the Caddo "for the 1835 cession was so inadequate as to amount to unconscionable consideration amounting to prima facie evidence of fraud."

Count II, as amended, alleged that the Caddo at one time held Indian title to, and ownership of, lands in the present State of Texas, and that such lands "were taken by the United States without any compensation whatsoever between 1845, the year Texas was admitted into the Union as a state of the United States, and the year

1859 when * * * [the Caddo] were removed from the state of Texas."

Count III alleged that the consideration of $80,000 which the Government agreed to pay the Caddo as compensation under the 1835 treaty was wrongfully and illegally expended by an Indian agent for the benefit of the Government and not for the benefit of the Caddo.

Count IV, as amended, alleged that the Caddo formerly held Indian title to, and ownership of, lands within the present States of Oklahoma, Arkansas, and Louisiana (in addition to the lands claimed in counts I and II), and that such lands "were taken by the United States without any compensation whatsoever, between 1803, the date of the Louisiana Purchase by the United States from France and the Caddo treaty of July 1, 1835 (7 Stat. 470)."

Count V, which is the part of the complaint directly involved in the present problem, contained the following allegations:

23. That during all of the time here involved Defendant has been the guardian of Plaintiffs and their property and undertook to care for and administer the property of Plaintiffs and their ancestors and predecessors and to protect the title to their lands.

24. That Plaintiffs are entitled to an accounting for all property and money belonging to Plaintiffs which have come into the hands of the Defendant or under its control.

The final count, count VI, was very general, and alleged that the Government, in its dealings with the Caddo, as set out in the other counts of the complaint, "did not deal fairly and honorably" with the Caddo.

The land claims asserted by the plaintiffs in count I, in count II (as amended), and in count IV (as amended) were considered and disposed of by the Indian Claims Commission while the case was pending before that tribunal.

The Commission upheld the plaintiffs' claim with respect to the land referred to in count I of the complaint. *Caddo Tribe of Oklahoma v. United States*, 4 Ind.Cl.Comm.

201, 212–13 (1956). The Commission determined that such land had a fair market value of $463,475.55 on the effective date of the 1835 treaty, and that the stated consideration of $80,000 under the 1835 treaty was an unconscionable consideration. *Caddo Tribe of Oklahoma v. United States*, 8 Ind.Cl.Comm. 354, 372 (1960).

With respect to the land claims asserted in count II (as amended) and in count IV (as amended), the Commission concluded that the Caddo did not possess aboriginal title to such lands at the times when United States sovereignty attached to the areas claimed, and that the plaintiffs' claims for compensation on the basis of the alleged taking of these lands were without merit. Accordingly, the Commission dismissed the claims under counts II and IV of the complaint, as amended. *Caddo Tribe of Oklahoma v. United States*, 35 Ind.Cl.Comm. 321, 376–77 (1975).

The Commission, however, did not determine the defendant's liability to the plaintiffs under count III of the complaint for the allegedly wrongful expenditure of the $80,000 which the Government agreed to pay the Caddo as compensation in accordance with the 1835 treaty; and, as indicated hereafter the Commission did not determine the defendant's liability on most of the claims asserted under the allegation in count V that the Government failed to discharge properly its responsibility as guardian to care for and to administer the Caddo's property.

### The GAO Report

Pursuant to the request in count V for "an accounting for all property and money belonging to Plaintiffs which have come into the hands of the Defendant, or under its control," the General Accounting Office prepared a voluminous report dealing with various financial matters. The Government filed the GAO report with the Indian Claims Commission in docket No. 226 as defendant's exhibit No. 0–2.

In the proceedings before the Indian Claims Commission, the plaintiffs took a number of exceptions to the GAO report.

Seven of these exceptions, numbered 1, 3, 4, 5, 6, 7, and 8, were not disposed of by the Commission before transferring the case to the court.

Six of the seven exceptions that have not been disposed of (*i. e.*, those other than exception No. 8) are in the nature of accounting exceptions. Steps leading toward their disposition are being taken in the Trial Division.

#### Exception No. 8

Included in the GAO report were data concerning the proceeds received by the Government in connection with the disposition of the surplus lands of the Wichita Reservation that were not needed for the making of allotments to individual Indians.

Among the exceptions which the plaintiffs took to the GAO report was an exception which was numbered 8 and which stated in pertinent part as follows:

8. *Sources of Revenue in the amount of $836,246.35.* The G.A.O. Report is insufficient in its disclosure of the identification of plaintiffs' reservation lands from which the proceeds of $836,246.35 is disclosed as having been received from the sale of the unallotted portion of plaintiffs' reservation. The identification of the lands are necessary in order to proceed with a determination whether or not the arbitrary per acre price of $1.25 per acre was the fair market value of the plaintiffs' unallotted reservation lands that were set aside for schools and public buildings and opened for settlement and entry after conclusion of allotments in 1902. These lands are identified as 79,-611.65 acres reserved for schools and public buildings * * *.

The two pending motions, asking the court to establish the date or dates of valuation, relate to exception 8, just quoted. The problem before the court, therefore, is to establish the date or dates as of which the surplus unallotted lands of the Wichita Reservation should be valued. Having determined the proper date or dates for valuation purposes, the court can then proceed to determine whether the plaintiffs have a valid claim against the Government with respect to such lands and, if so, the amount due the plaintiffs on the claim.

This is the only claim in the nature of a land claim that remains in the case for disposition at the trial level.

In its motion of July 18, 1978, the defendant asks that the court establish March 2, 1895 (*i. e.*, the date of the act dealing with the 1891 Jerome agreement), as the date for the valuation of the surplus unallotted lands of the Wichita Reservation.

On the other hand, the plaintiffs, in their motion of November 1, 1978, assert that the surplus unallotted lands of the Wichita Reservation should be valued as of: (1) the dates of the patents from the United States as to lands disposed of to settlers under the public land laws; (2) the respective dates on which the public land surveys were approved by the Commissioner of the General Land Office as to sections reserved for schools; and (3) the respective dates on which title was conveyed or confirmed by the United States as to lands disposed of or reserved for purposes other than those mentioned in (1) and (2).

The conflicting views of the parties concerning the proper date or dates of valuation reflect the parties' present disagreement on the question of whether, in substance as well as in form, the act of March 2, 1895, ratified the Jerome agreement of 1891. The defendant contends that the question of ratification should be answered in the affirmative; that the Jerome agreement became effective when ratified by Congress; and, accordingly, that the surplus unallotted lands of the Wichita Reservation were disposed of by the Government pursuant to the Jerome agreement. The defendant says, in this connection, that the proper date for the valuation of lands ceded by an Indian tribe to the United States is the date of ratification of the treaty or agreement of cession, if the treaty or agreement states (as did the Jerome agreement) that it is to be effective when ratified. The defendant cites *Choctaw Nation v. United States*, 1 Ind.Cl.Comm. 304, 322 (1950), and

other decisions in support of this proposition.

On the other hand, the plaintiffs argue that the act of March 2, 1895, despite its language of ratification, actually did not ratify the Jerome agreement of 1891 but, instead, "abandoned" the agreement by making material changes without the consent of the Indians; that the Jerome agreement never became effective; that the surplus unallotted lands of the Wichita Reservation were taken by the United States under the Fifth Amendment; and, accordingly, that such lands should be valued as of the dates of the takings.

The parties dispute whether the plaintiffs timely and properly raised the point that the acquisition of the surplus unallotted lands occurred through a unilateral taking by the United States which is compensable under the Fifth Amendment, rather than that the lands were acquired under the Jerome agreement. The court need not reach that question because it is satisfied, as the following discussion shows, that, even if we assume *arguendo* that the issue of a Fifth Amendment taking was properly and timely presented, there was no such taking in this case.

### The 1895 Act

The 1895 act quoted the Jerome agreement of 1891 verbatim, and then provided that "said agreement be, and the same hereby is, accepted, ratified, and confirmed as herein provided." (28 Stat. 876, 897). The plaintiffs' argument that the 1895 act "abandoned" the Jerome agreement is based upon several subsequent provisions of the act which the plaintiffs regard as major departures from the terms of the Jerome agreement.

The plaintiffs say, first, that the 1895 act, without the consent of the Indians, made a major change in the Jerome agreement with respect to the payment for the lands of the Wichita Reservation that were not needed for allotments to individual Indians. On this point, the Jerome agreement provided that "the question as to what sum of money, if any, shall be paid to * * *

[the Indians for the possessory right claimed by them in the] surplus lands shall be submitted to the Congress of the United States, the decision of Congress thereon to be final and binding upon said Indians * * *." (28 Stat. 876, 896).

The 1895 act provided that "whenever any of the lands acquired by this agreement shall, by operation of law or proclamation of the President * * *, be open to settlement, they shall be disposed of under the general provisions of the homestead and town-site laws"; that entrymen should pay $1.25 per acre for such lands; that the money thus received by the Government should be deposited in the Treasury, subject to the outcome of litigation which the act authorized; that the Court of Claims should have jurisdiction to adjudicate claims asserted by the Choctaw and Chickasaw Nations of interests in the lands of the Wichita Reservation, such action to be defended by the Wichita and affiliated bands of Indians (including the Caddo); that no part of the proceeds from the disposition of the surplus unallotted lands of the Wichita Reservation "shall be paid to said Indians until the question of title to the same is fully settled"; and that any award of compensation to the Indians by the court should not exceed the rate of $1.25 per acre. (28 Stat. 876, 897–99).

As the Jerome agreement of 1891 specifically left to the discretion of Congress the question as to what sum of money, if any, should be paid to the Wichita and affiliated bands of Indians (including the Caddo) for the surplus unallotted lands of the Wichita Reservation, and specifically declared that the decision of Congress on this question should be final and binding upon the Indians, it is very difficult to perceive any discrepancy between this provision of the Jerome agreement and the statutory provisions summarized in the preceding paragraph of the opinion. In the 1895 act, Congress was merely exercising its discretion, expressly granted in the Jerome agreement, by providing that the Indians of the Wichita Reservation should receive the proceeds from the sale of the surplus unallot-

ted lands under the public land laws at $1.25 per acre, if the reservation Indians were able to establish their claim to such lands as being superior to the conflicting claims of the Choctaws and Chickasaws. (It should be kept in mind that we are not concerned now with the question of whether this constituted fair and honorable dealing with the Indians, or led to an unconscionable consideration or other ground of revision stated in 25 U.S.C. § 70a(3), but only with the question of whether the act violated the agreement.)

It is appropriate to note that the litigation authorized in the 1895 act was ultimately concluded by a Supreme Court decision holding that the Choctaws and Chickasaws did not have any interest in the lands of the Wichita Reservation "since the absolute cession made by them to the United States in the treaty of 1866"; and that the Wichita and affiliated bands of Indians (including the Caddo) were entitled to "have the benefit of the proceeds of the sale of such lands in the Wichita Reservation as are not needed for the purposes indicated in the [1895] act of Congress." *United States v. Choctaw Nation and Chickasaw Nation*, 179 U.S. 494, 549–50, 21 S.Ct. 149, 170–171, 45 L.Ed. 291 (1900).[3]

Secondly, according to the plaintiffs, the 1895 act changed the Jerome agreement of 1891 by providing that, out of any amount found by the court to be due the Wichita and affiliated bands of Indians (including the Caddo), there should be paid to the estate of a deceased Indian agent such sum, up to a maximum of $15,000, as the Secretary of the Interior might find to be due under an agreement between the Indian agent and the Wichita and affiliated bands of Indians (28 Stat. 876, 897).

The Jerome agreement did not contain any reference to the payment of money to the estate of the deceased Indian agent. There was no inconsistency between the Jerome agreement and the 1895 act on this

point, however, inasmuch as the Jerome agreement specifically left to the unfettered discretion of Congress all matters bearing upon the amount, if any, that the reservation Indians were to receive for the surplus unallotted lands of the Wichita Reservation, and declared that the decision of Congress on such matters would be final and binding on the Indians. (28 Stat. 876, 896). (Whether this constituted fair and honorable dealing with the Indians, or a cause for revision of the agreement, is not before us at the present time.)

(The propriety of the $15,000 payment to the estate of the deceased Indian agent has already been considered and upheld by the Indian Claims Commission in passing upon one of the exceptions taken by the plaintiffs to the GAO report. *Caddo Tribe of Oklahoma v. United States*, 40 Ind.Cl. Comm. 266, 281–82 (1977)).

In the third place, the plaintiffs assert that the 1895 act departed substantially from the terms of the Jerome agreement of 1891 with respect to school lands. The Jerome agreement provided that none of the Indians could select as an allotment land "that is now used or occupied, or that has been or may hereafter be set apart for * * school * * * or other public uses, or in sections sixteen (16) and thirty-six (36) in each * * * township," unless an Indian was already occupying, and had made improvements upon, an area in a section 16 or 36 (28 Stat. 876, 895).

The 1895 act declared that sections 13, 16, 33, and 36 in each township should not be subject to entry, but should be reserved for use by the then Territory and future State of Oklahoma; that sections 16 and 36 were to be used for common schools, and sections 13 and 33 were to be used for institutions of higher learning and for public buildings; that if Oklahoma lost any of these sections, in whole or in part, by reason of Indian allotments, it should receive an equal quan-

---

**3.** It was entirely reasonable for the Congress, in view of the dispute over the Wichita Reservation, to provide for this judicial determination. In contemplating that Congress could decide to pay nothing at all to the Caddos—this is clear both from the text of the Jerome agreement and from the history of its negotiation— the agreement implied that Congress could find out whether the Caddos had any interest in the lands for which payment should be made.

tity of other lands, not occupied; and that the Government should "pay the Indians for said reserved sections the same price as is paid for the lands not reserved." (28 Stat. 876, 897).

There was no difference of major significance between the Jerome agreement and the 1895 act with respect to school lands.

Under the Jerome agreement, the Indians could not select section 16 or section 36 lands for individual allotments (unless they were already occupying and had made improvements on such lands). The 1895 act did not make any change with respect to the selection of lands in sections 16 and 36 for allotments.

Under the Jerome agreement, the Indians could select individual allotments out of sections 13 and 33 unless such sections were "set apart for * * * school * * * or other public uses." (28 Stat. 876, 895). The 1895 act did not expressly prohibit the Indians from selecting section 13 or section 33 lands for allotments (although it did expressly prohibit entries on these sections under the public land laws). (See, 28 Stat. 876, 897). However, even if the 1895 act were construed as prohibiting the Indians from selecting lands in sections 13 and 33 for individual allotments, the statutory provision would not be contrary to the Jerome agreement. The possibility that areas, in addition to sections 16 and 36, might thereafter be reserved for schools and other public uses, and thus become unavailable for Indian allotments, was specifically provided for in the Jerome agreement. (See, 28 Stat. 876, 895).

From the standpoint of the Indians, it was immaterial whether unallotted lands were disposed of under the public land laws or reserved for Oklahoma, inasmuch as the Indians were to receive the same price for such lands in any event (i. e., such amount, up to $1.25 per acre, as the court might allow). (See, 28 Stat. 876, 897). Thus, there was no inconsistency between the 1891 Jerome agreement and the 1895 act of ratification insofar as this particular matter is concerned.

Finally, the plaintiffs say that the 1895 act "eliminated" a provision in the Jerome agreement which stated that the Wichita Reservation should be "classified into grazing and grain-growing land, and when so classified each of said Indians shall be required to take at least one-half in area of his or her allotment in grazing land * *." (28 Stat. 876, 895). The plaintiffs, however, do not point to any provision in the 1895 act which rescinded, or was inconsistent with, the portion of the Jerome agreement just quoted.

It therefore appears, upon consideration of the provisions of the 1895 act which the plaintiffs rely upon in asserting that the act "abandoned" and did not ratify the Jerome agreement, that this contention cannot be sustained. On the contrary, the conclusion is warranted that the 1895 act did indeed ratify the Jerome agreement, as expressly stated in the act itself.

The discussion as to whether the 1895 act "abandoned" or ratified the Jerome agreement of 1891 should not be concluded, however, without referring to this court's decision in the case of *United States v. Kiowa, Comanche and Apache Tribes of Indians,* 163 F.Supp. 603, 143 Ct.Cl. 534 (1958). That case involved an agreement dated October 6, 1892, between a federal commission (headed by the same David H. Jerome previously mentioned in this opinion) and the Kiowa, Comanche, and Apache Tribes for the cession by the tribes of certain lands located in the present State of Oklahoma. The agreement contained a provision stating that it would become effective only when ratified by Congress. 163 F.Supp. at 607, 143 Ct.Cl. at 539. In the act of June 6, 1900 (31 Stat. 672, 676), Congress purported to ratify the 1892 agreement. The court, however, upheld a ruling by the Indian Claims Commission that Congress did not actually ratify the 1892 agreement, because the purported act of ratification contained provisions that varied materially from the 1892 agreement. *Id.*

The court pointed out in the *Kiowa* case, 163 F.Supp. at 607, 143 Ct.Cl. at 540, that whereas the 1892 agreement provided that

the Indians were to receive $2,000,000 for their surplus lands, with $200,000 in cash to be distributed per capita within 120 days after ratification of the agreement, $200,000 to be paid one year after the first payment, $100,000 to be paid one year after the second payment, and interest at the rate of 5 percent on the remaining $1,500,000 to be paid to the Indians per capita annually, the 1900 purported act of ratification provided that $500,000 was to be distributed per capita at such times and in such manner as the Secretary of the Interior should deem to be for the best interests of the Indians, and that interest on the remaining $1,500,000 was to be paid annually to the Indians per capita only if they were successful in defending a lawsuit which Congress authorized the Choctaws and Chickasaws to institute in the Court of Claims to determine the rights of these tribes to a reversionary interest in the unallotted lands. These statutory provisions were obviously a sharp departure from the unequivocal commitment in the 1892 agreement with respect to the amount and manner of payment.

By contrast, the Jerome agreement of 1891 that is involved in the present case did not contain any promise of payment to the Wichita and affiliated bands of Indians (including the Caddo). Instead, the Jerome agreement left the matter of payment entirely up to Congress, which then dealt with the subject in the 1895 act. (The usual reminder is inserted that we are not concerned at the present time with the question of whether this constituted fair and honorable dealing with the Indians, or cause for revision of the agreement under 25 U.S.C. § 70a(3), but merely with whether the 1895 act departed in a significant way from the terms of the Jerome agreement as to payment for the ceded lands.)

In the *Kiowa* case, the court also said that there were other inconsistencies between the 1892 agreement and the 1900 purported act of ratification. 163 F.Supp. at 607, 143 Ct.Cl. at 539. In our case, it has already been pointed out that there were no substantial conflicts between the provisions of the 1891 Jerome agreement, on the one hand, and the provisions of the 1895 act of ratification, on the other hand.

In previous cases involving claims by Indian tribes based upon allegedly unfair prices received by the Indians from the Government for lands ceded under treaties or agreements which provided that they would become effective only when ratified, this court adopted the respective dates of ratification as the proper dates for the valuation of the ceded lands in question. *Nez Perce Tribe of Indians v. United States*, 176 Ct.Cl. 815, 818 (1966), *cert. denied*, 386 U.S. 984, 87 S.Ct. 1285, 18 L.Ed.2d 233 (1967); *Sac and Fox Tribe of Indians of Oklahoma v. United States*, 383 F.2d 991, 992, 999, 179 Ct.Cl. 8, 11, 23, *cert. denied*, 389 U.S. 900, 88 S.Ct. 220, 19 L.Ed.2d 217 (1967); *Lummi Tribe of Indians v. United States*, 181 Ct.Cl. 753, 768 (1967); *Pillager Bands of Chippewa Indians in State of Minnesota v. United States*, 428 F.2d 1274, 1280, 192 Ct.Cl. 698, 709–10 (1970).

In the present case, therefore, March 2, 1895—the date on which the Jerome agreement of 1891 was ratified—is the proper date as of which the surplus unallotted lands of the Wichita Reservation will be valued for the purpose of determining whether the defendant dealt fairly and honorably with the plaintiffs, and not in contravention of the standards set forth in 25 U.S.C. § 70a(3), by paying them a fair price for their interest in such lands pursuant to the cession under the Jerome agreement of 1891.

## CONCLUSION OF LAW

Upon the foregoing opinion, the court concludes as a matter of law that for the purpose of determining the application of 25 U.S.C. § 70a(3) or (5) in connection with the price paid to the plaintiffs for their interest in the surplus unallotted lands ceded under the agreement of June 4, 1891, such lands should be valued as of March 2, 1895, and judgment is entered to that effect. In the light of this conclusion, further proceedings will be conducted by the trial judge and the case is remanded to him for that purpose.