The MINNESOTA CHIPPEWA
TRIBE, et al.,

The Red Lake Band, Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 19, 189–A.

United States Claims Court.

Aug. 22, 1990.

Marvin J. Sonosky, Washington, D.C., for plaintiffs.  Anne D. Noto and Rodney J. Edwards, of counsel.

Pamela S. West, Washington, D.C., for defendant.  Thornton Withers Field and Kent W. Fulton, of counsel.

## OPINION

BRUGGINK, Judge.

Nearly four decades ago, these consolidated cases arose.  Docket 19 was filed by the Minnesota Chippewa Tribe ("Minnesota Chippewa" or "Tribe"), which consists of six Bands of the Tribe.  Docket 189–A was filed on behalf of the Red Lake Band of the Minnesota Chippewa ("Red Lake" or "Band").  The cases were consolidated and both plaintiffs have continued to have the same representation for the past 39 years.  That arrangement now has been called into question by defendant's pending motion.  Defendant has moved for the realignment of Minnesota Chippewa as a defendant with respect to Exception 41, a claim filed exclusively by Red Lake.[1]  In sum, defendant's position is that, as to this exception, the two plaintiff groups are adverse in their

---

1.  The motion was filed on June 1, 1989.  After hearing, it was denied by Order of June 8, 1989, without prejudice to reassertion.  On January 3, 1990, plaintiffs moved that the court fix a briefing schedule on the issues raised by the motion.  A schedule was established, and the pleadings have taken the form of argument pro and con on "Defendant's Statement Re: Adverse Positions of Plaintiffs."  The matter has been extensively briefed and orally argued.

interests, that Minnesota Chippewa should be realigned as to Exception 41, and that present counsel should withdraw as to one or both entities with respect to all future litigation. The questions of realignment and withdrawal of counsel are controlled by similar considerations. Plaintiffs' counsel need not withdraw if there is no need for realignment.

## I. BACKGROUND

Familiarity with the extensive procedural and substantive history of this action will be presumed. That background is largely set out at *Minnesota Chippewa Tribe v. United States*, 11 Cl.Ct. 221 (1986); *Minnesota Chippewa Tribe v. United States*, 14 Cl.Ct. 116 (1987); and *Red Lake Band v. United States*, 17 Cl.Ct. 362 (1989). Critical to resolving the present issues is the background of Exception 41. That exception was filed by the Red Lake Band in 1970, in response to the 1963 Report of the General Accounting Office ("GAO Report"). The exception and portions of the 14 page statement in its support are quoted below. References to the Act of 1889 are to the Nelson Act, ch. 24, 25 Stat. 642 (1889) ("Nelson Act"). The Nelson Act is the primary controlling document in this litigation with respect to the parties' legal relationship.

Exception No. 41. For failure to pay the Red Lake Band a share of the proceeds under the 1889 Act proportionate to the contribution of the Band.

Statement in support of Exception No. 41. From the time of the Treaty of 1863 as supplemented by the Treaty of 1864, creating the original Red Lake Reservation, the United States recognized Royce 446 as the separate reservation of the Red Lake Band, and not the common property of all the Chippewa Indians in Minnesota. The Supreme Court and the Court of Claims both have so held. (Citation omitted.)

Immediately prior to the Act of January 14, 1889, *supra*, the Red Lake treaty reservation (Royce 446) contained 3,569,694.29 acres. The 1889 Act created a common pool containing 3,669,200.96 acres of ceded in trust land. The Red Lake Band was induced to contribute 2,905,921.28 acres representing 79.2% of the common pool. (Citation omitted.) On March 4, 1890, the effective date of the 1889 Act, there were 8,304 enrolled Chippewas in Minnesota of whom 1,168 or about 14% were members of the Red Lake Band. (Citation omitted.)

According to the defendant's "accounting" report, a total of $26,708,062.20 in receipts from the common pool was disbursed on the ratio of about 15.7% to Red Lake and 84.3% to the other Chippewas in Minnesota. (Footnote omitted.)

Where an Indian tribe is induced to contribute 79.2% of the assets in a common pool, in trust, in return for 15.8% of the proceeds from the assets, that tribe has been overreached. There was no consideration for the transaction. At best it was a scheme to convert land and timber into money under which the United States used the property of one tribe, Red Lake, for the alleged benefit of other Indians. The arrangement was unconscionable, unfair and dishonorable. It cannot be justified on any standard of justice.

The Band is pursuing Exception No. 41 under clause 5, section 2 of the Indian Claims Commission Act, 25 U.S.C. § 70a et seq. (1976) ("ICC Act"). That clause recognizes claims "based upon fair and honorable dealings that are not recognized by any existing rule of law or equity." *See* discussion and cases cited at 11 Cl.Ct. 221, 236–38; 17 Cl.Ct. 362, 387–90. The relief sought by Red Lake is a money recovery from the United States. No claim is made against other bands of the Minnesota Chippewa Tribe.

Exception 41 was explained by Red Lake during discovery:

By exception 41, the Red Lake Band, based on Section 5 of the Indian Claims Commission Act, claims that it was not fair and honorable as to the Red Lake Band for the United States by the 1889 Act to obtain a cession of an estimated 2.9 million acres belonging to the Band, and pay in return less to the Band than

the fair market value of those estimated 2.9 million acres....

The position of the other bands as to Exception 41 was also recently set out in discovery responses:

> Exception 41 was filed on behalf of the Red Lake Band only. In Docket 19, the six Bands other than Red Lake, based on Section 2 of the Indian Claims Commission Act, generally claim that the six Bands are entitled to their *per capita* share (estimated 86%) of the fair market value of all acres ceded in trust under the Nelson Act (estimated 3.67 million acres) as promised to the six Bands in the Act. (Emphasis added.)

The United States filed responses to Red Lake's exceptions. With respect to Exception 41, it stated:

> The United States denies that it was under a legal duty to account for or pay to the Red Lake Band any percentage of the proceeds of the funds generated under the [Nelson Act] other than as provided in those acts of Congress. The United States alleges that all funds generated under the acts of Congress referred to above have been paid as provided in the acts. 1963 Accounting Report. In the alternative, the United States alleges that if it has paid any funds belonging to the Red Lake Band to other bands of the Chippewa Indians of Minnesota, *the United States is entitled to recoup from the other bands in these consolidated proceedings such overpayments.*

(Emphasis added.)

## II. DISCUSSION

### A. *Preliminary considerations.*

In their complaints, both plaintiffs contend, pursuant to section 2, clause 3 of the ICC Act, that they received unconscionable consideration for Indian lands and timber. *See* 25 U.S.C. § 70a. If the court finds that there is liability based on both entities'

claims for what they say is the difference between fair market value and the amounts credited from sales for land and timber, the court would be faced with a question as to how to distribute or credit those proceeds. It bears noting that, while the Minnesota Chippewa are seeking, pursuant to the Nelson Act, "their *per capita* share" of the fair market value of the acres ceded, in fact the Nelson Act formula is more complex. Plaintiffs' counsel conceded as much during oral argument when he contended that it is the actual patterns of distribution which developed over the years which dictate use of a straight per capita formula. Under section 7 of the Nelson Act, one quarter of the interest annually accumulated was to be paid out on a per capita basis.[2] That same section called for one half the interest to be paid to heads of families and to guardians of orphans and for the remainder to be spent on education. That section also called for a distribution of trust principal remaining at the end of fifty years "to all of said Chippewa Indians then living, in cash, in equal shares." In fact, no principal remained at the end of fifty years. The reason for this is that Congress exercised its authority to appropriate amounts from the principal fund for specific needs and for per capita distributions.

Plaintiffs argue that additional proceeds generated under any Nelson Act theory of recovery should be treated as remaining principal and, pursuant to section 7, distributed on a per capita basis. That is a persuasive argument. Distribution patterns based on need or "head of family" will no doubt approximate a straight per capita distribution, particularly when combined with frequent and periodic distributions from both principal and interest on a per capita basis. This is borne out by the ultimate distribution patterns as Red Lake illustrates in its exception. There, Red Lake contends that its members constituted 14% of the Chippewas of Minnesota in 1890. Ultimately 15.8% was disbursed to or on behalf of Red Lake Band members.[3]

---

**2.** Section 7 of the Nelson Act is reprinted in full at Appendix A.

**3.** The court recognizes that plaintiffs have raised the issue of whether those funds actually

benefitted the Indians. The court has already disallowed some disbursements credited to Red Lake on that basis. 17 Cl.Ct. at 473–74.

A per capita approach to distributing any recovery, or certainly any recovery from the land and timber valuation trial, has the added appeal of simplicity and arguably best captures the intent of the Nelson Act.

What remains, however, is the fact that distribution of a recovery as between present members of the various bands will not be self-evident. Questions will undoubtedly arise. Should Red Lake be slightly favored in the distribution because its members received more than a per capita distribution, presumably based on greater need? Should the number of persons living in 1890 control, or should it be the relative proportion of their descendants presently living or living at the time the trust theoretically should have been dissolved? Would it make a difference if funds were treated as reintroduced *nunc pro tunc* to the time of the inadequate sale or the disallowed disbursement, and thus, not treated as undisbursed principal? The simple, and indeed probable answer to these questions is that a per capita distribution based on present members is the fairest and simplest remedy. The difficulty for the court is that if there is any flexibility in application of the Act to a recovery, or even a good argument to be made in favor of flexibility, the plaintiffs will be at odds. Not having reached that point, it is even more problematic, at this time, to say that the distribution process will involve no analysis or discretion.

B. *Exception 41 concerns.*

■ The preceding considerations apply even when attention is focused exclusively on the Nelson Act claims. In fairness to plaintiffs, however, these considerations do not form the real basis for defendant's present motion—Exception 41. A literal reading of Exception 41 and of defendant's demand for recoupment suggests that there is a conflict. The exception itself demands 79.2% of the "proceeds under the 1889 Act." The proceeds under the Nelson Act, if plaintiffs' claims based on unconscionable consideration are successful,

would still be circumscribed by the fair market value of the land or timber. Thus, only 20.8% would be left for the Minnesota Chippewa. This strongly suggests a competition between the Bands over a finite sum. This is consistent with the explanation of the exception, which states that Red Lake lands were used "for the alleged benefit of other Indians."

The background materials concerning the negotiations leading up to the Nelson Act were introduced into the record of the Red Lake disbursements trial and have surfaced periodically at other points in the litigation. It is contended by the Red Lake Band that other Bands agreed to what became the Nelson Act because it was explained that members of those Bands would disproportionately benefit from a per capita distribution of funds derived in large measure from Red Lake lands. Red Lake Band members, on the other hand, were pressured and threatened into agreement. This arrangement, according to Red Lake, was a "scheme" to convert land and timber into money for the benefit of non Red Lake Indians. "The arrangement was unconscionable, unfair and dishonorable."

It would appear, therefore, that the two plaintiff entities have fundamentally different views of the Nelson Act with respect to distribution of proceeds. Minnesota Chippewa seeks to enforce the population-based scheme. Red Lake contends that the 1889 arrangement was unfair.

Counsel for the plaintiffs takes the position that this difference in approach to the Nelson Act does not in fact create a conflict of interest. This is so, plaintiffs argue, because Red Lake is merely contending that the Nelson Act arrangement was unfair as to *it*, not as to other Chippewa Indians.[4] That assertion is certainly true in the sense that other Indians were not hurt by the arrangement. Population-based distribution was not unfair to *them*. It seems artificial in the extreme, however, to ignore the logical follow-on to Red

---

4. "By Exception 41, the Red Lake Band does not contend that the Nelson Act is void. The Band seeks *revision* of the Nelson Act agreement *as to* *the Band* because the Act–Agreement is less than fair and honorable *to the Band*." Brief of May 23, 1990 (emphasis in original).

Lake's position, namely, that the arrangement was, *a fortiori*, unfair to Red Lake precisely because it gave an inappropriate advantage to the remaining bands. The United States did not receive a direct financial benefit from the "per capita" arrangement. Minnesota Chippewa did, however. There is no avoiding the conclusion that Red Lake has to make the argument that the entire arrangement, with respect to population-based distribution, was unfair and that distribution should have been based on the value of land and timber ceded by each Band.

Counsel contends that Minnesota Chippewa has no incentive to challenge Red Lake's position. (It can also be said, however, that the Tribe has no reason to support Red Lake's assertions in that regard.) That assertion, however, is based on some critical assumptions.

It is plain that if, as plaintiffs allege, there is no conflict in their positions, it can only be because the two plaintiff entities are seeking to have the Government pay twice for most of the ceded land. The Band, under clause 5, claims the fair market value of all the land and timber it contributed, not just its per capita share. In terms of acreage, Red Lake contributed approximately 79% of the land sold. The remaining bands, on the other hand, want to be paid approximately 84% of the fair market value of all land and timber proceeds, whether attributable to their lands or Red Lake lands. The claims thus far exceed 100% of the value of the land and timber.

Counsel's contention that there is no conflict, therefore, is correct only if both parties' present-day litigating positions are successful. If the question is broadened to ask whether there was a conflict in the past, it has to be conceded that the two entities' views of the fairness of the Nelson Act distribution formula would have been different. The simplest way to illustrate this is to return to the time immediately prior to ratification of the agreement that lead to the Act. The parties' present views of the formula adopted in the agreement would have been incompatible with rat-

ification of the agreement as drafted. The non-Red Lake Bands would have sought 84% of the proceeds while the Red Lake Band would have sought payment for the land it contributed. If the Bands had legal representation, presumably they would have had to have separate counsel.

Plaintiffs' counsel discounts the relevance of any possible historical ground for differences between the Bands by contending that present-day legal remedies make possible the award of a sum in excess of the fair market value of the Indians' land and timber. If plaintiffs are correct, the possibility of a conflict is eliminated so long as defendant is unsuccessful in its claim for recoupment. In the ideal scenario for plaintiffs, both bands recover under the Nelson Act formula—the Red Lake Band is additionally paid based on the value of the land and timber attributable to the Band (offset by Nelson Act recoveries), and the Government is solely liable. If plaintiffs' assumption is incorrect, however, a very different scenario emerges. If there is no double recover, it then would be in Minnesota Chippewa's interest to adhere to a per capita distribution and to oppose Exception 41.

In the present plan of progression for this litigation, the court would not reach the merits of Exception 41 at least until after conclusion of the land and timber valuation trial and after resolution of Minnesota Chippewa disbursements. Other claims, such as those relating to the posting of proceeds to the credit of the trust fund, to the sawmill accounting, and to interest, would also have to be concluded before defendant's offsets and counterclaims would be litigated. In short, the defendant's present motion forces the court to evaluate the legal and factual bases of both Exception 41 and the defendant's recoupment claim before they have been fully presented.

Defendant contends that there is no authority to award a double recovery, i.e., to have the Government in effect pay twice for the same land. Although that is in fact what occurred in litigation involving the Blackfeet Tribe, defendant contends, and

the court agrees, that the result in that case was *sui generis*.[5] The parties have not cited the court to any decisions specifically sanctioning double payment for the same lands, and the court has not independently discovered any such precedent. On the other hand, the court is not aware of any explicit statutory or judicially-created prohibition on such a remedy.

It is apparent that if the court ultimately concludes that it can and should permit a double recovery, it will be because both plaintiffs' Nelson Act claims and Red Lake's fair and honorable dealings claim are treated as totally independent of each other. The issue becomes whether the Nelson Act can be revised under clause 3 because of unconscionable consideration irrespective of Red Lake's clause 5 claim for unfair dealing. Stated differently, can the Nelson Act be revised twice in ways that lead to two different and inconsistent reformulations?

Plaintiffs contend that these docket numbers should be viewed as separate claims. In one sense that is correct. The Tribe's claim under the Act to the fair market value of 84% of the land and timber is independent of the Band's fair and honorable dealings claim. The claims could have been separately litigated. These cases were consolidated, however, because they are factually related. They both arise out of the same circumstances—the cessions and agreements associated with the Nelson Act. It is inconceivable to the court that, in resolving what the Band should have received, it would not take cognizance of what the Tribe did receive, and vice versa. If Red Lake is successful on Exception 41, it will be because the court found that it was unfair and dishonorable, at the time of the agreement, not to give the Band the value of the proceeds of its own land and timber. The analog of that conclusion could well be that it was unfair and dishonorable to give the Minnesota Chippewa Tribe 84% of the proceeds.

It bears noting, moreover, that Minnesota Chippewa's claim under clause 3 depends for its success upon the inclusion of Red Lake lands into the "equation." For Minnesota Chippewa to succeed, therefore, it must rely upon the distribution proportions created by the ICC Act. If it had to rely solely on the lands contributed by its member Bands, the comparison to fair market value would be very different.

Without in any way prejudging the facts, it is certainly not inconceivable that in determining whether Minnesota Chippewa received "unconscionable consideration," the court would take account of the fact that the two entities were contributing and receiving unequal shares. In the typical circumstance, one tribe is seeking redress based on a disparity between the lands *it* ceded and the value of those lands. *See, e.g., Caddo Tribe of Oklahoma v. United States*, 222 Ct.Cl. 306, 614 F.2d 272 (1980); *United States v. Creek Nation*, 201 Ct.Cl. 386, 476 F.2d 1290 (1973). As this court stated in *Northern Paiute Nation v. United States*, 10 Cl.Ct. 401, 411 (1986), "Where, as here, a tribe claims damages for a failure of consideration, it is essentially seeking … redress for a wrong done to it, i.e., loss of tribal lands." The court is unwilling, at this stage in the litigation, to foreclose the possibility that it would take account, in the Nelson Act claims, of the facts established by Red Lake in its fair and honorable dealings claim.

It is easy to foresee that the court would not treat reformation of the treaty in docket 189–A in isolation. The court could conclude, particularly if there were a recovery

5. In *United States v. Assiniboine Tribes*, 192 Ct.Cl. 679, 428 F.2d 1324 (1970), the court dealt with a defense similar to the one raised by defendant here. There, the Indian Claims Commission had awarded judgments to four tribes as if they had ceded a total of nearly 21 million acres. In fact, they had ceded approximately 15 million acres. The award to the Blackfeet and Gros Ventre tribes, which the Government claimed received duplicate compensation, was settled in a different proceeding. The court acknowledged that affirming the award to the Assiniboine would put the Government in the position of paying twice, but held that the Government had waived its right to complain about that fact in the later, separate proceeding by agreeing to a separate settlement as to the Blackfeet and Gros Ventre. *Id.* at 686, 428 F.2d at 1327.

on the land and timber valuation claims, that a comprehensive adjustment should be made that takes account of Red Lake and the Minnesota Chippewa Bands simultaneously.[6] In this regard, it is noteworthy that both clauses 3 and 5 of section 2 of the ICC Act allow a party to raise what our predecessor court has referred to as "extra-legal or moral claims." *Otoe and Missouria Tribe*, 131 Ct.Cl. at 621, 131 F.Supp. at 283. Such claims involve principles of "honor, fairness, and morality not cognizable in conventional law or equity." *Confederated Tribes of the Colville Reservation v. United States*, 20 Cl.Ct. 31, 37 (1990).

An additional, though related consideration, is the Government's assertion of a right of recoupment from Minnesota Chippewa with respect to any liability to Red Lake on the fair and honorable dealings claim. The conflict of interest between the Red Lake Band and the Minnesota Chippewa Tribe in this circumstance is apparent, as plaintiffs concede, if the claim can be asserted. It would be in the interest of the Tribe to defeat Exception 41, if it were possible that the six Bands would have to reimburse the Government.[7] If, on the other hand, the Government could not pass along that liability, it would have to pay the Minnesota Chippewa under the Nelson Act and pay the Red Lake under a fair and honorable dealings theory, as to some of the same land, without recouping any of this from the Tribe. In the latter circumstance, there would be no conflict between Red Lake and the other bands because the claims of both groups would be satisfied by the Government.

Plaintiffs respond to the defendant's argument concerning recoupment by questioning its legal viability. Initially, the court observes that offsets normally would not be addressed until after resolution of plaintiffs' claims. These are unusual circumstances, however, and if the court seriously suspected that it could hold at this point that there was no support for defendant's position, it would be willing to address that issue in order to possibly eliminate the appearance of a conflict. However, the court is unwilling to hold, as the law of this case, that no such offset could be asserted.

Offsets are made possible by section 2 of the ICC Act:

> In determining the quantum of relief the Commission shall make appropriate deductions for all payments made by the United States on the claim, and for all other offsets, counterclaims, and demands that would be allowable in a suit brought in the Court of Claims under section 1491 of title 28: Provided, That expenditures for food, rations, or provisions shall not be deemed payments on the claim. The Commission may also inquire into and consider all money or property given to or funds expended gratuitously for the benefit of the claimant and if it finds that the nature of the claim and the entire course of dealings and accounts between the United States and the claimant in good conscience warrants such action, may set off all or part of such expenditures against any award made to the claimant....

25 U.S.C. § 70a. At the outset, plaintiffs argue that no offsets could be assessed against Minnesota Chippewa in connection with an award to Red Lake, because Minnesota Chippewa is not a "claimant" as to Exception 41, which is part of docket No.

---

**6.** The court nevertheless disagrees with defendant's contention that Red Lake cannot recover on its fair and honorable dealings claim without insisting that the Nelson Act be voided. The Act could theoretically be partially reformed and partially enforced. *See Creek Nation v. United States*, 168 Ct.Cl. 483, 489–90 (1964); *Otoe and Missouria Tribe of Indians v. United States*, 131 Ct.Cl. 593, 602, 131 F.Supp. 265, 271, *cert. denied*, 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955); *Minnesota Chippewa Tribe*, 11 Cl.Ct. 221 at 237–38, 240 n. 9 (1986).

**7.** Although it is not clear from the recoupment claim, apparently the defendant would only seek reimbursement to the extent that the Minnesota Chippewa had actually received funds. In its pleading of May 2, 1990, for example, the Government recites that "if the Band proved liability and any damages, the United States, as trustee would seek to collect from the overpaid beneficiary, the Minnesota Chippewa Tribe, which had been unjustly enriched."

189–A. That misses defendant's point, however. Minnesota Chippewa is a claimant in docket No. 19. Defendant, in that docket, wants to offset liability it may have incurred in docket No. 189–A. At this point in the litigation, the court sees no theoretical bar to defendant's assertion of an offset merely because it arose out of liability to another entity.

The court notes that in *Sioux Tribe of Indians v. United States*, 7 Cl.Ct. 481 (1985), *vacated on other grounds sub nom., Cheyenne River Sioux Tribe v. United States*, 806 F.2d 1046 (Fed.Cir. 1986), the Government was allowed to offset, against a recovery by the Sioux, the value of land belonging to the Ponca Tribe which the Government had inadvertently given to the Sioux. Moreover, the argument could be made that even if the value of the land could not be offset as a payment on the claim, the value of the land nevertheless could be taken into account in determining in the first instance whether there had been unconscionable consideration. *See Miami Tribe of Oklahoma v. United States*, 222 Ct.Cl. 242, 246 n. 4, 614 F.2d 1273, 1279 n. 4 (1980) (expenditures for food, rations or provisions not allowed as offsets, but relevant in determining whether consideration was unconscionable) (citing *Sioux Nation of Indians v. United States*, 220 Ct.Cl. 442, 453 n. 4, 601 F.2d 1157, 1163 n. 4 (1979)), *cert. denied sub nom., Hannahville Indian Community v. United States*, 449 U.S. 822, 101 S.Ct. 82, 66 L.Ed.2d 25 (1980).

The court concludes that the interests of Red Lake and Minnesota Chippewa carry the potential for conflict with respect to Exception 41.[8] Defendant believes, with respect to Exception 41, that Minnesota Chippewa should be realigned as a party defendant. The Court agrees. One alternative would be to sever docket Nos. 189–A

and 19 with respect to that exception and leave it to Minnesota Chippewa to decide whether to seek to intervene and in what capacity. However, the more straight forward approach is to adopt defendant's suggestion. In that way the cases remain fully consolidated. If Red Lake is successful in Exception 41, defendant could argue its position on recoupment in docket No. 19 against Minnesota Chippewa, which would still be aligned as a plaintiff for all claims other than Exception 41.

## C.  *Other considerations.*

■ The precise issue before the court is whether to realign Minnesota Chippewa. In its January 3, 1990 motion requesting a briefing schedule on the realignment question, however, plaintiffs express the view that the issue of realignment implicates ethical considerations for counsel. Although the question does not arise in the context of an attorney disciplinary proceeding, the court agrees that similar factors apply with respect to deciding if there is a conflict between clients. The applicable rules of conduct are instructive, and it is the court's desire to adhere to them to avoid creating a conflict for plaintiffs' counsel. Nevertheless, counsel will no doubt separately evaluate the issue.

The parties agree that the applicable standard is set out in the Rules of Professional Conduct of the District of Columbia Court of Appeals ("DC Rules of Conduct"). Those rules, adopted in March, 1990, regulate the activities of counsel of record for plaintiffs, Marvin Sonosky, who is a member of the District of Columbia Bar ("D.C. Bar"). These rules govern an attorney's relationship to the D.C. Bar.

Defendant points to Rule 1.7, "Conflict of Interest: General Rule."[9] The rule is quoted below in its entirety:

---

**8.** Defendant relies for support on the configuration of the parties' interests in litigation in docket No. H–76 concerning Minnesota Chippewa's effort to have lands reserved by the Red Lake Band declared to be held in common ownership by all the Chippewas of Minnesota. *Chippewa Indians v. United States*, 80 Ct.Cl. 410 (1935). Red Lake intervened in that suit and was ultimately successful in blocking the effort by the

other Bands. The circumstances here are different. The fact that the entities were aligned against each other in H–76 does not automatically dictate realignment here.

**9.** RUSCC Appendix F addresses enforcement of disciplinary rules to counsel. That appendix adopts as a Code of Professional Responsibility the American Bar Association Model Rules of

(a) A lawyer shall not represent a client with respect to a position to be taken in a matter if that position is adverse to a position taken or to be taken in the same matter by another client represented with respect to that position by the same lawyer.

(b) Except as permitted by paragraph (c) below, a lawyer shall not represent a client with respect to a matter if:

(1) A position to be taken by that client in that matter is adverse to a position taken or to be taken by another client in the same matter;

(2) Such representation will be or is likely to be adversely affected by representation of another client;

(3) Representation of another client will be or is likely to be adversely affected by such representation; or

(4) The lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property or personal interests.

(c) A lawyer may represent a client with respect to a matter in the circumstances described in paragraph (b) above if:

(1) Each potentially affected client provides consent to such representation after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation; and

(2) The lawyer is able to comply with all other applicable rules with respect to such representation.

The commentary to the rule makes clearer the distinction between paragraphs (a) and (b). Paragraph (a) is an absolute prohibition on representation with respect to positions taken, or to be taken, in a given matter, when the two clients are adverse as to those positions.

When applied to the present circumstance, Rule 1.7 would appear to have the following effect. Because the positions of the entities are potentially adverse as to Exception 41, present counsel could not, under any circumstances, represent both entities as to that exception. Present counsel would not be able to remain as counsel for both entities on other positions (paragraph (b)) unless there was informed consent (paragraph (c)). The exception created in paragraph (c) has not yet been invoked.

Defendant contends that it could be awkward for the same counsel to represent both the Band and the Tribe as to the land and timber valuation issues. This is based on the assumption that the court is unwilling or unable, at this stage, to rule both that there will be a double recovery if the facts warrant and that defendant cannot recover on its recoupment claim. In this circumstance, defendant alleges that there would be an incentive for each entity to place a disproportionately high value on the land and timber it contributed. In all candor, the court sees the likelihood for conflict of interest to be extremely attenuated. It would equally be in the interest of both parties to place as high a value as possible on all the land in order to support their unconscionable consideration claims. The greater the value of the land and timber, the more each party could potentially recover. Nevertheless, in the court's view, questions of conflict of interest are as much a concern and obligation of counsel as of the court. During oral argument, plaintiffs' counsel agreed with defendant that, if the court holds there is a potential conflict of interest as to Exception 41 and if it refuses to rule out recoupment, there might be an incentive to advance one entity's claim to the disadvantage of the other. Therefore, the court reluctantly agrees that, due to the importance of the land and

Professional Conduct ("Model Rules"). The DC Rules of Conduct are largely derived from the Model Rules. Model Rule 1.7 is different than DC Rule 1.7 although both deal with conflict of interest. DC Rule 1.7 incorporates and modifies parts of Model Rule 1.9, which addresses conflicts arising out of previous associations. The

DC Rule is more specific in that it distinguishes more clearly between conflicts as to a position and conflicts as to an entire "matter." The commentary to Model Rule 1.7, however, makes clear that the purpose and import of the rules is the same.

timber valuation issues, continued representation of both parties is inappropriate.

Rule 1.9 would govern with respect to whether counsel could continue as to one entity. The rule states the following:

A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

In its role of shepherding this ancient litigation to a conclusion, the court is obligated to consider the effects of granting defendant's motion. This case and a handful like it are unique. These entities have been represented by the same counsel for 39 years. Exception 41 has been of record since 1970. The litigation has proceeded with no assertion of a conflict in the interests of the two entities based on the exception until 1989. Present counsel for plaintiffs not only has invested an enormous amount of effort in these claims, he and his office are in possession of huge volumes of materials necessary to litigating the claims. Nevertheless, having ruled that the potential exists for a conflict of interest because of Exception 41, the court feels constrained to grant defendant's motion, not only with respect to realignment of the parties, but also to advise counsel for the plaintiffs that it appears inconsistent with the DC Rules to have counsel continue to represent either party absent consent.

The court makes this ruling reluctantly, in part for the reasons set forth in the paragraph above, but also because the incorrect appearance may be created that the court has some reservations about the quality and zeal of plaintiffs' counsel's prior representation of both entities. No appearance could further deviate from reality.

## CONCLUSION

The motion for realignment as to Exception 41 is granted. In order to implement this ruling, new counsel will be obtained for at least one of the plaintiffs, at least as to Exception 41. It will be necessary for the plaintiffs to determine whether Red Lake or Minnesota, or either, will retain present counsel, and if so, to what extent. It will be necessary to obtain the consents of both parties if present counsel will remain in any capacity. Within 30 days of the date of this opinion, parties, and, if appropriate, counsel are ordered to file notices informing the court of their intentions with respect to RUSCC 81(d)(3) and (d)(5).[10]

This ruling, while interlocutory, involves a controlling question of law as to which there is substantial ground for difference of opinion. It will also have a dramatic impact on the length of time in which this case is resolved. An immediate appeal may materially advance the ultimate termination of the litigation. *See* 28 U.S.C. § 1292(d)(2) (1988).

## Appendix A

Sec. 7. That all money accruing from the disposal of said lands in conformity with the provisions of this act shall, after deducting all the expenses of making the census, of obtaining the cession and relinquishment, of making the removal and allotments, and of completing the surveys and appraisals, in this act provided, be placed in the Treasury of the United States to the credit of all the Chippewa Indians in the State of Minnesota as a permanent fund, which shall draw interest at the rate of five per centum per annum, payable annually for the period of fifty years, after the allotments provided in this act have been made, and which interest and permanent fund shall be expended for the benefit of said Indians in manner following: One-half of said interest shall, during the said period of fifty years, except in the cases hereinafter otherwise provided, be annually paid in cash in equal shares to the heads of families and guardians of orphan minors for their use; and one-fourth of said interest shall, during the same period and with

---

**10.** In the event of an appeal of this opinion and affirmance of the result, the time for filing the notification will run from the date of the mandate.

the like exception, be annually paid in cash in equal shares per capita to all other classes of said Indians; and the remaining one-fourth of said interest shall, during the said period of fifty years, under the direction of the Secretary of the Interior, be devoted exclusively to the establishment and maintenance of a system of free schools among said Indians, in their midst and for their benefit; and at the expiration of the said fifty years, the said permanent fund shall be divided and paid to all of said Chippewa Indians and their issue then living, in cash, in equal shares: *Provided,* That Congress may, in its discretion, from time to time, during the said period of fifty years, appropriate, for the purpose of promoting civilization and self-support among the said Indians, a portion of said principal sum, not exceeding five per centum thereof. The United States shall, for the benefit of said Indians, advance to them as such interest as aforesaid the sum of ninety thousand dollars annually, counting from the time when the removal and allotments provided for in this act shall have been made, until such time as said permanent fund, exclusive of the deductions hereinbefore provided from shall equal or exceed the sum of three million dollars, less any actual interest that may in the meantime accrue from accumulations of said permanent fund; the payments of such interest to be made yearly in advance, and, in the discretion of the Secretary of the Interior, may, as to three-fourths thereof, during the first five years be expended in procuring live-stock, teams, farming implements, and seed for such of the Indians to the extent of their shares as are fit and desire to engage in farming, but as to the rest, in cash; and whenever said permanent fund shall exceed the sum of three million dollars the United States shall be fully reimbursed out of such excess, for all the advances of interest made as herein contemplated and other expenses hereunder.